FILED
2020 JUL -1 PH 3:43
CIVIL DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2020-05403 DIVISION "   " SECTION 15

CALLEN J. CORTEZ

versus

LAMORAK INSURANCE COMPANY (as successor in interest to the liability for policies of insurance issued by COMMERCIAL UNION INSURANCE COMPANY, COLUMBIA CASUALTY COMPANY, EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY, and AMERICAN EMPLOYERS INSURANCE COMPANY); HUNTINGTON INGALLS INCORPORATED (formerly NORTHROP GRUMMAN SHIPBUILDING, INC. formerly NORTHROP GRUMMAN SHIP SYSTEMS, INC. formerly AVONDALE INDUSTRIES, INC. formerly AVONDALE SHIPYARDS, INC. formerly AVONDALE MARINE WAYS, INC.); ALBERT J. BOSSIER, JR.; EAGLE, INC. (f/k/a EAGLE ASBESTOS & PACKING COMPANY, INC.); BAYER CROPSCIENCE, INC. (successor TO RHONE POULENC AG COMPANY formerly AMCHEM PRODUCTS, INC. formerly BENJAMIN FOSTER COMPANY); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC. AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); TAYLOR-SEIDENBACH, INC.; CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORP.); UNIROYAL, INC.; INTERNATIONAL PAPER COMPANY; ANCO INSULATIONS, INC.; RILEY POWER, INC. (formerly BABCOCK BORSIG POWER, INC. formerly DB RILEY, INC., formerly RILEY STOKER CORPORATION); OCCIDENTAL CHEMICAL CORPORATION (formerly, HOOKER CHEMICALS & PLASTICS CORP. formerly HOOKER CHEMICAL CORPORATION); SHELL OIL COMPANY; PHARMACIA LLC (formerly PHARMACIA CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO MONSANTO COMPANY, SUCCESSOR TO MONSANTO CHEMICAL COMPANY, AND SUCCESSOR TO LION OIL COMPANY); VULCAN MATERIALS COMPANY; GOODRICH CORPORATION (f/k/a THE BF GOODRICH COMPANY); AXIALL CORPORATION (DE) (f/k/a GEORGIA GULF CORPORATION); TEXACO INC.; CF INDUSTRIES NITROGEN, LLC (f/k/a TERRA MISSISSIPPI NITROGEN, INC., f/k/a MISSISSIPPI NITROGEN, INC., f/k/a TRIAD NITROGEN, INC.); BASF CORPORATION f/k/a INMONT CORPORATION f/k/a MEW CORPORATION (OF DELAWARE) f/k/a BASF WYANDOTTE CORPORATION f/k/a and that WYANDOTTE CHEMICALS CORPORATION; HOUSTON GENERAL INSURANCE COMPANY; BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY (f/k/a STONEWALL INSURANCE COMPANY), UNITED STATES FIDELITY AND GUARANTY COMPANY; FIRST STATE INSURANCE COMPANY; CONTINENTAL INSURANCE COMPANY (successor by merger to FIDELITY AND CASUALTY COMPANY OF NEW YORK); UNION CARBIDE CORPORATION; ENTERGY LOUISIANA, LLC; LIBERTY MUTUAL INSURANCE COMPANY; TRAVELERS INDEMNITY COMPANY; LOUISIANA INSURANCE GUARANTY ASSOCIATION; and THE CAJUN COMPANY

FILED: _____

DEPUTY CLERK

**PETITION FOR DAMAGES**

The petition of Callen J. Cortez, a person of the full age of majority and resident of the

State of Louisiana, with respect represents:

1.

Defendants, Eagle, Inc. and Taylor-Seidenbach, Incorporated, are domestic corporations with

their registered offices in the Parish of Orleans, State of Louisiana. In addition, tortious conduct of

Eagle, Inc., Taylor-Seidenbach, Incorporated, The McCarty Corporation, and Halter Marine, Inc.,

occurred in the Parish of Orleans. Moreover, Henry "Zac" Carter, C. Edwin Hartzman, Hettie Dawes

VERIFIED

Eaves, Ewing Moore, and Harold P. Halter were domiciled in Orleans Parish at the time of their deaths. Also, Halter Marine, Inc.'s and B&B Engineering and Supply Company of Louisiana, Inc.'s registered office was located in the Parish of Orleans. Additionally, Mr. Cortez was exposed to asbestos in the Parish of Orleans and received injury in the Parish of Orleans. Accordingly, venue is proper in Orleans Parish against all defendants pursuant to Louisiana Code of Civil Procedure Articles 42, 73, and 74.

2.

LAMORAK INSURANCE COMPANY (as successor in interest to the liability for policies of insurance issued by COMMERCIAL UNION INSURANCE COMPANY, COLUMBIA CASUALTY COMPANY, EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY, and AMERICAN EMPLOYERS INSURANCE COMPANY), HUNTINGTON INGALLS INCORPORATED (formerly NORTHROP GRUMMAN SHIPBUILDING, INC. formerly NORTHROP GRUMMAN SHIP SYSTEMS, INC. formerly AVONDALE INDUSTRIES, INC. formerly AVONDALE SHIPYARDS, INC. formerly AVONDALE MARINE WAYS, INC.), ALBERT J. BOSSIER, JR., EAGLE, INC. (f/k/a EAGLE ASBESTOS & PACKING COMPANY, INC.), BAYER CROPSCIENCE, INC. (successor TO RHONE POULENC AG COMPANY, formerly AMCHEM PRODUCTS, INC., formerly BENJAMIN FOSTER COMPANY), FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION), GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.), TAYLOR-SEIDENBACH, INC., CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORP.), UNIROYAL, INC., INTERNATIONAL PAPER COMPANY, ANCO INSULATIONS, INC., RILEY POWER, INC. (formerly BABCOCK BORSIG POWER, INC. formerly DB RILEY, INC. formerly RILEY STOKER CORPORATION), OCCIDENTAL CHEMICAL CORPORATION (formerly HOOKER CHEMICALS & PLASTICS CORP. formerly HOOKER CHEMICAL CORPORATION), SHELL OIL COMPANY, PHARMACIA LLC (formerly PHARMACIA CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO MONSANTO COMPANY, SUCCESSOR TO MONSANTO CHEMICAL COMPANY, AND SUCCESSOR TO LION OIL COMPANY), VULCAN MATERIALS COMPANY, GOODRICH CORPORATION (f/k/a THE BF GOODRICH COMPANY), AXIALL CORPORATION (DE) (f/k/a GEORGIA GULF CORPORATION), TEXACO INC., CF INDUSTRIES NITROGEN, LLC (f/k/a TERRA MISSISSIPPI NITROGEN, INC., f/k/a

MISSISSIPPI NITROGEN, INC., f/k/a TRIAD NITROGEN, INC.), BASF CORPORATION f/k/a INMONT CORPORATION f/k/a MEW CORPORATION (OF DELAWARE) f/k/a BASF WYANDOTTE CORPORATION f/k/a WYANDOTTE CHEMICALS CORPORATION, HOUSTON GENERAL INSURANCE COMPANY, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY (f/k/a STONEWALL INSURANCE COMPANY), UNITED STATES FIDELITY AND GUARANTY COMPANY, FIRST STATE INSURANCE COMPANY, CONTINENTAL INSURANCE COMPANY (successor by merger to FIDELITY AND CASUALTY COMPANY OF NEW YORK), UNION CARBIDE CORPORATION, ENTERGY LOUISIANA, LLC, LIBERTY MUTUAL INSURANCE COMPANY, TRAVELERS INDEMNITY COMPANY, LOUISIANA INSURANCE GUARANTY ASSOCIATION, and THE CAJUN COMPANY (hereinafter collectively referred to as "defendants"), are all corporations incorporated under the laws of the various states of the United States. Defendants all have their principal place of business in various states of the United States, as well as some foreign countries. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

From approximately 1969 through 1974, while Callen J. Cortez was a direct employee of Huntington Ingalls Incorporated (formerly Northrop Grumman Shipbuilding, Inc., formerly, Northrop Grumman Ship Systems, Inc., formerly, Avondale Industries, Inc., formerly Avondale Shipyards, Inc., formerly Avondale Marine Ways, Inc.) (hereinafter "Avondale"), Henry "Zac" Carter, C. Edwin Hartzman, Ewing Moore, John McCue, Ollie Gatlin, Earl Spooner, James T. Cole, Burnette "Frenchy" Bordelon, James O'Donnel, Peter Territo, George Kelmell, J. Melton Garrett, Edward Blanchard, John Chantrey, Steven Kennedy, Dr. Joseph Mabey, Red Whittle, and Albert J. Bossier, Jr., were executive officers of Avondale with the specific responsibility for the health and safety of Callen J. Cortez and his fellow employees during the time Mr. Cortez was exposed to substances which resulted in his mesothelioma and other ill effects related thereto. Henry "Zac" Carter, C. Edwin Hartzman, Ewing Moore, John McCue, Ollie Gatlin, Earl Spooner, James T. Cole, Burnette "Frenchy" Bordelon, James O'Donnel, Peter Territo, George Kelmell, J. Melton Garrett, Edward Blanchard, John Chantrey, Steven Kennedy, Dr. Joseph Mabey, and Red Whittle have since died. Pursuant to Louisiana Revised Statute 22:1269, plaintiff herein asserts a direct action against Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Columbia Casualty Company, Employers Commercial

- 3 -

Union Insurance Company, and American Employers Insurance Company) for the liability of Avondale, J. Melton Garrett, as well as the following deceased executive officers: Henry "Zac" Carter, C. Edwin Hartzman, Ewing Moore, John McCue, Ollie Gatlin, Earl Spooner, James T. Cole, Burnette "Frenchy" Bordelon, James O'Donnel, Peter Territo, George Kelmell, J. Melton Garrett, Edward Blanchard, John Chantrey, Steven Kennedy, Dr. Joseph Mabey, Red Whittle, and Albert J. Bossier, Jr.

4.

Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Columbia Casualty Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company), Houston General Insurance Company, Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), First State Insurance Company, and United States Fidelity and Guaranty Company provided coverage to Eagle, Inc. for the liability asserted herein, and plaintiff asserts a direct action pursuant to Louisiana Revised Statute 22:1269 against these insurance companies for the liability of Eagle, Inc.

5.

Liberty Mutual Insurance Company and Travelers Indemnity Company provided coverage to B&B Engineering and Supply Company of Louisiana, Inc. for the liability asserted herein, and plaintiff asserts a direct action pursuant to Louisiana Revised Statute 22:1269 against Liberty Mutual Insurance Company and Travelers Indemnity Company for the liability of B&B Engineering and Supply Company of Louisiana, Inc.

6.

Plaintiff also makes claims against The Louisiana Insurance Guaranty Association ("LIGA"), a private non-profit unincorporated legal entity created by LSA-R.S. 22:1375, which is the legal successor to American Mutual Liability Insurance Company based upon policies of insurance, included but not limited to, employers' liability, commercial general liability insurance policies and/or excess liability insurance policies sold by American Mutual Liability Insurance Company to Gabler Insulations and/or Gabler Insulations, Inc. providing coverage for the liability asserted herein. By order of the Massachusetts Supreme Judicial Court in Boston dated January 17, 1989, Massachusetts Insurance Commissioner Roger M. Singer was appointed Temporary Receiver of American Mutual Liability Insurance Company and on March 8, 1989, Commissioner Singer was appointed Permanent receiver and an order of liquidation was granted.

- 4 -

The court further found that American Mutual Insurance Company to be insolvent. LIGA was subsequently appointed to handle and dispose of pending claims in Louisiana.

7.

From approximately 1974 through 1975, Callen J. Cortez was a direct employee of Halter Marine, Inc. (hereinafter sometimes referred to as "Halter" or "Halter Marine") and was exposed to asbestos. During this time, Harold P. Halter, James A. Dubuisson, Jr., Floyd Naquin, and Oliver Hebert were executive officers of Halter Marine with specific responsibilities for the health and safety of Mr. Cortez and his fellow employees at the time Mr. Cortez was exposed to the substances which resulted in his mesothelioma and other related ill health effects. Harold P. Halter, James A. Dubuisson, Jr., Floyd Naquin, and Oliver Hebert are deceased. Likewise, Halter Marine is no longer in business. Pursuant to the Louisiana Revised Statute 22:1269, plaintiff herein asserts a direct action against Continental Insurance Company (successor by merger to Fidelity and Casualty Company of New York) who, at all times material herein, was the insurance carrier covering Halter Marine and the executive officers of Halter Marine for the liability asserted herein. As stated above, Harold P. Halter, James A. Dubuisson, Jr., Floyd Naquin, and Oliver Hebert were also the executive officers of Halter Marine with specific responsibilities for the health and safety of Mr. Cortez and his fellow employees. They, too, were covered for the liability asserted herein by Continental Insurance Company (successor by merger to Fidelity and Casualty Company of New York), and plaintiff asserts a direct action against this insurance company for the liability of these individuals as well as Halter Marine.

8.

Callen J. Cortez was employed in various positions by or on the premises of the following companies, among others: Avondale from 1969 through 1974; and Halter Marine from approximately 1974 through 1975. Throughout these time periods, Mr. Cortez was exposed to asbestos. Also, Mr. Cortez was exposed to asbestos carried home on his person, clothing, and other items. Additionally, while employed at Avondale, Mr. Cortez was exposed to asbestos while riding to and from work with other Avondale employees whose person, clothing, and other items were contaminated with asbestos. Prior to September of 1975, Mr. Cortez was exposed to asbestos on a daily basis and he contracted mesothelioama as a result thereof, although it did not manifest itself until 2020. These exposures to Mr. Cortez at Avondale and Halter Marine prior to September of 1975 caused and/or contributed to his development of mesothelioma and other related ill health effects, although the disease did not manifest itself at that time. Mr. Cortez's diagnosis of asbestos-

related mesothelioma is directly attributable to his exposure to asbestos fibers prior to September of 1975. The medical evidence shows that Mr. Cortez began to sustain tissue damage shortly after the inhalation of asbestos fibers and that he sustained distinct bodily injury in each year of his occupational exposure to asbestos. On a daily basis during Mr. Cortez's employment by or on the premises of Avondale and Halter Marine he was exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of his work. At all times during Mr. Cortez's foregoing employment, he was exposed to asbestos and asbestos-containing products manufactured, distributed, sold, and/or handled by "defendants." Additionally, Mr. Cortez was exposed to asbestos while riding to and from work at Avondale with other employees whose person, clothing, and other items were contaminated with asbestos.

9.

Defendants, Avondale and Halter Marine, had the responsibility for the health and safety of Callen J. Cortez and his fellow employees during the time Mr. Cortez was exposed to the substances which resulted in his mesothelioma and other ill health effects related thereto. Avondale and Halter Marine had the responsibility of providing Mr. Cortez with a safe place to work; however, they failed to protect him from the dangers of asbestos exposure, for which Avondale and Halter Marine are liable to plaintiff. Additionally, Avondale and its executive officers and Halter Marine and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos and that Mr. Cortez would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Cortez knowledge of the dangers to his health from exposure to asbestos fiber.

10.

In addition to the foregoing acts of negligence and intentional concealment, Avondale and its executive officers and Halter Marine and its executive officers are guilty of the following:

a) Failing to reveal and knowingly concealing critical medical information to Mr. Cortez;

b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos and other harmful substances in their manufacturing process and/or in connection with the work which exposed Mr. Cortez;

c) Failing to provide necessary protection to Mr. Cortez;

d) Failing to provide clean respirable air and proper ventilation;

e) Failing to provide necessary showers and special clothing;

f)      Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

g)      Failing to provide necessary and adequate respiratory protection;

h)      Failing to warn employees of the dangers associated with exposure to asbestos;

i)      Failing to use non-asbestos containing products on jobs where non-asbestos containing products were specified.

j)      Requiring employees to dispose of asbestos in dumpsters, into the river, and onto the land instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

k)      Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

l)      Failing to warn of the dangers of exposure to asbestos;

m)      Requiring employees to dispose of asbestos without precautions to prevent exposure;

n)      Failing to post warnings regarding asbestos and the hazards of same;

o)      Failing to warn employees that exposure to asbestos could cause deadly diseases including mesothelioma, cancer, asbestosis, pleural thickening, and pleural plaques; and

p)      Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, cancer, and mesothelioma.

These defendants and individuals committed these intentional acts knowing full well that Mr. Cortez's injuries would follow or were substantially certain to follow.

11.

Calise Cortez was the father of Callen J. Cortez. Calise Cortez was employed in various positions by or on the premises of the following: B&B Engineering and Supply Company of Louisiana, Inc. ("B&B") from approximately 1966 through 1968; Gabler Insulations, Inc. ("Gabler"); Anco Insulations, Inc. ("Anco") from approximately 1968 through 1969; and The Cajun Company ("Cajun") from approximately 1970 through 1972. On a daily basis during these employments, Calise Cortez was exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of his work. At all times during Calise Cortez's foregoing employments, he was exposed to asbestos and asbestos-containing products manufactured, distributed, handled, and sold by "defendants", and Callen Cortez was exposed to asbestos as a result thereof.

12.

On a daily basis throughout the of employment of Calise Cortez, Callen Cortez was exposed to dangerously high levels of asbestos carried home on the person, clothing and other items of Calise Cortez, through the contamination of the home as a result thereof, and through the handling and washing of clothing of Calise Cortez and other objects, which exposure was a significant contributing factor in Callen Cortez's mesothelioma.

13.

B&B, Gabler, Anco, and Cajun had the responsibility of providing Calise Cortez with a safe place to work and safety equipment with which to conduct his work (including but not limited to disposable overalls and showers); however, they negligently and/or intentionally failed to carry out these duties and failed to protect Calise Cortez from the dangers of toxic fiber and dust exposure, and failed to protect family members including Callen Cortez from said exposures to asbestos and toxic fiber.

14.

B&B, Gabler, Anco, and Cajun were aware or should have been aware of the dangerous condition presented by exposure to asbestos and that Callen Cortez (and other similarly situated family members of its working force) would suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld knowledge of the dangers to their health from exposure to asbestos fiber and other toxic substances.

15.

In addition to the foregoing acts of negligence and intentional concealment, B&B, Gabler, Anco, and Cajun are guilty of the following:

a)   Failing to reveal and knowingly concealing critical information from Calise Cortez and Callen Cortez, including the ability to expose family members to asbestos through clothing and other objects of its workers;

b)   Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos and other harmful substances in their manufacturing process;

c)   Failing to provide necessary protection to Calise Cortez and Callen Cortez, as well as to other family members;

d)   Failing to provide clean, respirable air and proper ventilation;

e)   Failing to provide protective or disposable clothing and showers to its employees so that asbestos fiber would not be brought home to family members;

- 8 -

f)   Failing to advise employees that deadly asbestos fiber could be brought home to their family members;

g)   Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

h)   Requiring employees to dump asbestos into the Mississippi River instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

i)   Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

j)   Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

k)   Failing to warn of the dangers of exposure to asbestos;

l)   Failing to warn employees and their families that asbestos fiber could be brought home on clothing and other objects, could expose innocent family members, and could cause deadly diseases to family members including mesothelioma, asbestosis, pleural thickening, and pleural plaques; and

m)   Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, pleurisy, diagphragmatic calcifications, cancer, and mesothelioma.

B&B, Gabler, Anco, and Cajun intentionally or negligently committed these acts knowing full well that Callen Cortez's injuries would follow or were substantially certain to follow.

16.

In addition to the acts of negligence, strict liability, intentional tort, and fault identified throughout this petition, B&B, Gabler, Anco, and Cajun are strictly liable for their care, custody, and control of asbestos. B&B, Gabler, Anco, and Cajun failed to properly handle and control the asbestos which was in their custody. B&B, Gabler, Anco, and Cajun were aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Calise Cortez and his family members would be exposed to asbestos and that family members, including Callen Cortez, would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of these exposures, but they failed and/or willfully withheld knowledge of the dangers to their health from exposure to asbestos fiber.

17.

As a result of these exposures to asbestos, Callen Cortez contracted mesothelioma which was first diagnosed on approximately June 2, 2020.

18.

Avondale and its executive officers and Halter Marine and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos and that Callen Cortez would suffer from asbestos-related disease, including mesothelioma, lung cancer, cancer, and other related ill health effects, as a result of this exposure, but they failed and/or willfully withheld from Mr. Cortez knowledge of the dangers to his health from exposure to asbestos fiber and other toxic substances.

19.

Avondale and its executive officers and Halter Marine and its executive officers had the responsibility of providing Callen Cortez with a safe place to work and safety equipment with which to conduct his work; however, they negligently and/or intentionally failed to carry out these duties and failed to protect Mr. Cortez from the dangers of toxic fiber and dust exposure knowing full well or being substantially certain that certain workers, including Mr. Cortez, would develop disease as a result thereof.

20.

All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Callen Cortez and for which these defendants are strictly liable under Louisiana law.

21.

Defendants, Avondale and its executive officers and Halter Marine and its executive officers, are answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Callen Cortez, and for which defendants are liable under Louisiana law.

22.

Avondale and its executive officers and Halter Marine and its executive officers failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Callen Cortez from the unreasonably dangerous conditions created by asbestos which existed at their job sites due to their failure to properly handle and control the asbestos which was in their care, custody, and control. At all times material herein, standards were in existence which

required Avondale and its executive officers and Halter Marine and its executive officers herein to provide to Mr. Cortez and his co-workers who handled or were exposed to harmful material with protection from the harms of asbestos. Avondale and Halter Marine failed and/or willfully refused to comply with these standards thereby resulting in exposure to asbestos to Mr. Cortez, thereby resulting in his injuries.

23.

Defendants, Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company), Houston General Insurance Company, Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), United States Fidelity and Guaranty Company, First State Insurance Company, and Continental Insurance Company (Successor by Merger to Fidelity and Casualty Company of New York), Travelers Indemnity Company, and Liberty Mutual Insurance Company knew or should have known of the hazardous health effects of asbestos, but failed to inform or intentionally concealed that information from Mr. Cortez and his fellow co-workers.

24.

As a result of the aforementioned acts of the hereinabove named defendants, Mr. Cortez contracted asbestos-related mesothelioma, and other related ill health effects as a result thereof, for which all defendants are jointly, severally, and in solido liable.

25.

At all times material herein, Callen Cortez was exposed to asbestos manufactured, distributed, and sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company. The asbestos-containing products manufactured, distributed and/or sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, these defendants failed and refused to warn Mr. Cortez of the danger of exposure to such products. They also failed to warn them of the invisible nature of the asbestos and that is could cause deadly diseases such as mesothelioma and cancer. As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, sold, and/or used by these companies, Mr. Cortez was exposed to asbestos fibers proximately causing his mesothelioma, cancer, and other related ill health effects. Plaintiff further contends that said defendants are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a

product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

26.

During Mr. Cortez's employment with Avondale, Hopeman Brothers, Inc. also performed contracting work wherein asbestos-containing products were used. During this contracting work, Hopeman Brothers, Inc. exposed Mr. Cortez to asbestos-containing products, which caused and/or contributed to his asbestos-related diseases and other related ill health effects. Defendant, Hopeman Brothers, Inc., had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Mr. Cortez and for which Hopeman Brothers, Inc. is strictly liable under Louisiana law. Moreover, defendant, Hopeman Brothers, Inc., is answerable for the conduct of those handling asbestos products over which it had control, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Mr. Cortez and for which defendant is strictly liable under Louisiana law.

27.

In addition to the aforementioned acts of negligence, intentional tort, fraud, and strict liability of Hopeman Brothers, Inc. and Wayne Manufacturing Co., Hopeman Brothers, Inc. is also liable because Wayne Manufacturing Corporation was the alter ego of Hopeman Brothers, Inc. at all time material herein.

28.

Plaintiff also makes additional allegations against Hopeman Brothers, Inc. who was aware of the risk of harm presented by its asbestos products. Hopeman Brothers, Inc. either through exchange of information and/or industry sponsored studies was notified, either directly by its parent companies or by its manufacturing associations, that their products presented an unreasonable risk of harm. However, Hopeman Brothers, Inc. disregarded these notices, elected to conceal these hazards from plaintiff and other workers, and continued to use and hold out these products as safe and non-toxic.

29.

Hopeman Brothers, Inc. was informed that asbestos dust presented health risks by the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The

U.S. Government issued advisories, through the U.S. Maritime Commission, to all government
contractors regarding their findings of enumerated health risks in the work place. During the
1950s, the Department of Defense adopted and distributed to all government contractors, safety
standards that pertained to the use of these defendants' products in various work places. In 1952,
Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S.
Government promulgated and published the Walsh-Healy Act which adopted safety standards
and regulations regarding asbestos dust. Based on information and belief, each of these
companies, their predecessor, and corporation officers were made aware of these findings at the
time they were issued. Despite this knowledge, these companies continued to manufacture,
distribute, relabel, fabricate, sell and install these products at plaintiff's worksites. This was done
without warning to plaintiff and without the knowledge on the part of the plaintiff that he was in
danger. Additionally, these defendants continued to market their products without disclosing the
dangers and simultaneously affirming that their products were safe and non-toxic.

30.

International Paper Company is the successor to U.S. Plywood. Throughout the time he
was employed at Avondale, Mr. Cortez was exposed to asbestos fiber from asbestos-containing
materials manufactured, distributed, and/or sold by U.S. Plywood. At the time of his exposure to
these products, they were being used in the manner and for the purpose for which they were
intended, and these products were in the same condition as when they left the control and
possession of U.S. Plywood.

31.

The asbestos-containing products manufactured, distributed and/or sold by U.S. Plywood
were unreasonably dangerous *per se*, were defective in design, and constituted a breach of
warranty from said manufacturer. Further, U.S. Plywood failed and refused to warn of the
danger of exposure to such products. They also failed to warn of the invisible nature of the
asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and
mesothelioma.

32.

During Callen Cortez's exposure, defendant, Westinghouse Electric Corporation (now
CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling
and/or distributing asbestos-containing materials to the employers of Callen Cortez and/or to the
owners of the premises where he worked, throughout his employment history. Such products

were installed, removed, and repaired by or in close proximity to Callen Cortez during his employment, thus exposing him to asbestos dust released by the installation, removal, and repair of said products. Throughout the time Callen Cortez was employed, he was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse. At the they were exposed to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse.

33.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturer. Further, Westinghouse failed and refused to warn Mr. Cortez of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

34.

Plaintiff further alleges that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

35.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma. Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council. Beginning in the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

36.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. IHF members included, among others, General Electric Company, Westinghouse Electric Corporation, or their predecessors in interest. All of these companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health

- 14 -

to its members.  Since its inception, it has published special bulletins on items of general interest
under the headings of legal bulletins, medical bulletins, management bulletins and engineering
bulletins.  Since 1937, member companies have been kept informed on occupational health
issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in
return for their annual membership fee.  The Digest is a compilation of abstracts, grouped by
topic, of the published domestic and foreign scientific and medical literature pertaining to
industrial health and hygiene.  In addition to scientific abstracts, the Digest included a section on
legal developments, and also provide notice of any proposed changes in threshold limit values for
various substances.  Correspondence between members and the IHF established that members
either participated in or knew of a number of studies and surveys dating as far back as the 1930's
which had linked asbestos with various lung diseases.  As part of its consultative services for its
members, the IHF undertook a number of studies involving evaluations of asbestos dust
conditions and asbestos-related disease.  In 1947, the fruits of an industry survey conducted by
the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for
Asbestos Textile Institute."  The report is dated June 1947.  The object of the investigation was
stated as:  "defining the specific nature and the magnitude of the (asbestosis) problem in all its
phases....An original objective of most immediate importance was to facilitate the exchange of
information between member companies on successful methods of dust control and otherwise to
promote a general improvement in that field."  The preliminary survey to be divided into three
parts designated as "Engineering, Medical and Physical Testing" was based on visits made to
member companies' plants over a three month period."  While the actual report does not reveal
the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that
other companies evaluated in the report included defendants in this case.  Minutes of the Air
Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and
presentations pertaining to appropriate medical practices and industrial hygiene approaches to the
problem of asbestos dust in the work place.  It was continually stressed that both pre-employment
and periodic follow-up medical examinations were essential to monitor the health of employees,
the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of
asbestos-related disease.  Some annual meetings apparently were held by the IHF.  The minutes
for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on
November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest.  An
Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed

- 15 -

inter alia dust particle size and dust control. A second report by Foundation Research at the
Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy
Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on
Workers' Compensation cases. A case involving the death of a North Carolina man was
discussed, the minutes indicating that the claimant sought compensation on grounds that the
defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the
award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also
recommended that pre-employment and periodic chest x-rays be conducted by a reputable
radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the
levels of dust in the air, and that various procedures be implemented to reduce the dust in
manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene
Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to
respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member
companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute
(ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C.
L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of
asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950)
of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed
to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold
limit value for asbestos was not safe. In addition, this criticism was published in the scientific
literature and all defendants were put on notice of the hazards of the suggested threshold limit
value.

37.

In addition, Westinghouse and/or its medical director and industrial hygienist became
members of the Konicide Club from 1932 through 1940. The Konicide Club was created to
understand and control the dust related diseases in the industry, and the members would meet to
discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club
even conducted a meeting which focused on the health problems of the asbestos industry in
particular.

38.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical
department in the 1940s regarding the high dust levels associated with asbestos cloth and the

mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

39.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

40.

Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

41.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies,

architectural reports, work papers, old work files, and other similar materials.  It was determined

that all such documents be destroyed, despite Federal Regulations requiring their retention.  This

document destruction was done with the specific intention of defrauding asbestos victims and the

courts before which Westinghouse would undoubtedly appear.  In the past, Westinghouse has

refused to respond to plaintiff's request for the production of these documents principally on the

basis that said documents did not exist due to their destruction.  Accordingly, plaintiff alleges

that Westinghouse's conduct constitutes fraud under Louisiana law.

42.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related

violations during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and

blanket plant.  Regarding these incidents, Westinghouse's attorneys maintained that

Westinghouse would not comply with either the EPA or OSHA and would take an attitude of

"respectful noncompliance".

43.

Westinghouse has engaged in a pattern of suppressing information with regard to its

asbestos-containing products and the health hazards associated with same.  Jeffrey J. Bair of

Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial

Hygiene Department files, dating back to 1930, have been reviewed.  After a general description

of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these

documents.  The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking
> gun" documents.  This is so because of the nature, duties, obligations and
> responsibilities of the Industrial Hygiene Department.  The approximately 57
> years of Industrial Hygiene files which are in existence today are filled with
> technical information, procedural information, safe-handling information, hazard
> information, recommendations and tests results.  The files are filled with
> documentation which critiques and criticizes, from an industrial hygiene
> perspective, Westinghouse manufacturing and non-manufacturing operations.
> This documentation often times points out deficiencies in Westinghouse
> operations and suggests recommendations to correct these deficiencies.  Industrial
> Hygiene's files contain information which details the various chemical substances
> used at Westinghouse sites over the years, and often times the inadequacies in
> Westinghouse's use and handling of the substances.  The files contain many years
> of employee test results, some of them unfavorable.  Industrial Hygiene, by
> performing its job, creates, daily, potential smoking gun documents (emphasis
> added).

> Plant Correspondence and Files

> Please see, for example, Wilber Speicher's letter...correspondence of this type was
> and continues to be, frequently generated by Industrial Hygiene.  Dr. Speicher's
> correspondence might show early knowledge of the Corporation to certain health
> hazards associated with epoxy resin dissolving agents.  What use did the

- 18 -

Corporation make of this knowledge to protect employees and the public? If none or very little, then this document might become a "<u>smoking gun</u>" (emphasis added).

Industrial Hygiene audit and trip reports certainly qualify as <u>potential smoking guns</u> (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective. Industrial Hygiene also makes recommendations to improve the hygiene of the plant. The <u>smoking gun possibilities</u> of such documentation are readily apparent (emphasis added). <u>Material Cards, Materials Safety Data Sheets, Purchasing</u> [sic] <u>Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files</u>

Again, the <u>smoking gun</u> possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent. In addition, <u>if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent</u> (emphasis added).

<u>Recommendations</u>

<u>Plant Correspondence Files</u> (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic records retention guidelines do not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded. As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations. The files are filled with technical product and chemical information, hazard information and safe-handling information, <u>most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner</u>. The files are not used in the daily operation of the Department. In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual. In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace. This "self-analysis" and "editorializing" type of information can be dangerous. This is just the type of documentation which should be discarded from the files. Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"<u>Historical Files or Industrial Hygiene Department</u>"

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic Records Retention Guidelines do not specifically address these records. We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

<u>Bair's Conclusions</u>

<u>Toxic tort litigation, including toxic tort-related workmen's compensation litigation, show no signs of abating in the near future</u>. In fact, legislation such as the risk notification legislation currently being considered by Congress, will, according to many "experts", result in an increase in such litigation. Consequently, well reasoned and conceived document retention and destruction

programs for departments such as Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its dangerous products. More importantly, his conclusion shows that Westinghouse had motive for destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations therein.

44.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation therof. This activity amounts to fraud and spoliation. In fact, at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

45.

The document destruction program set out in Bair's memo was <u>actually implemented</u> by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards associated with its products constitute fraud under the laws of the state of Louisiana.

46.

During Callen Cortez's exposure, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Mr. Cortez and/or to the owners of the premises where he worked, throughout his entire employment history. Such products were installed, removed, and repaired by or in close proximity to Callen Cortez during his employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time he was employed, Mr. Cortez was exposed to asbestos fiber from these asbestos-containing materials manufactured,

distributed, and/or sold by GE.  At the time of his exposure to these products, they were being used in the manner and for the purpose for which they were intended, and these products were in the same condition as when they left the control and possession of GE.

47.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturer.  Further, GE failed and refused to warn Mr. Cortez of the danger of exposure to such products.  They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

48.

Plaintiff further alleges that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold, and/or distributed.

49.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation.  General Electric's association with the Saranac Laboratory extends at least to the 1940s, where  Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric.  This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust.  More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended.  The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952,  Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950).  The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934.  This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer.  Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

50.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging and admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

51.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

52.

Moreover, various published reports and articles available to GE, prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

    (1)   Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2)     Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3)     Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.

(4)     Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s. Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis." Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.

(5)     Asbestos And Health In 1969, a published article written in 1969 by George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6)     The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7)     Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8)     Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

53.

Defendants, Anco Insulations, Inc, Bayer Cropscience, Inc. (as successor of liability to

Rhone-Poulenc AG Company f/k/a Amchem Products, Inc. f/k/a Benjamin Foster Company),

Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.), Foster-Wheeler, LLC (formerly

Foster Wheeler Corporation), General Electric Company, The McCarty Corporation (successor to

McCarty Branton, Inc., and predecessor and successor to McCarty Insulation Sales, Inc.), Riley

- 24 -

Power Inc. (formerly Babcock Borsig Power, Inc. formerly DB Riley, Inc., formerly Riley Stoker Corporation), CBS Corporation (f/k/a Westinghouse Electric Corporation), Uniroyal, Inc., Taylor-Seidenbach, Inc., International Paper Company, Gabler Insulations, B&B, and The Cajun Company were in the business of manufacturing, fabricating, selling and/or distributing asbestos-containing products, including but not limited to asbestos-containing pipe covering, pipe coating, blankets, special fittings, cloths, gaskets, blocks, valves, cements, mastics, jackets, board, turbines and/or boilers. These defendants sold to, installed, removed and/or abated these products at various premises at various times during Mr. Cortez's employments. In addition, Anco Insulations, Inc, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.), The McCarty Corporation (successor to McCarty Branton, Inc., and predecessor and successor to McCarty Insulation Sales, Inc.), Taylor Seidenbach, Inc., Foster Wheeler, Westinghouse, Riley Power, International Paper, General Electric, B&B, Gabler Insulations, and The Cajun Company distributed asbestos-containing products manufactured, distributed, and sold by various companies including Bayer Cropscience, Inc. (successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company)--(adhesives, coatings, sealants, and mastics),  Foster Wheeler LLC (formerly Foster Wheeler Corporation)--(block and boiler insulation), General Electric Company –(electric wire and cable, block, cloth, generators and generator insulation, turbines and turbine insulation including, but not limited to sprayed asbestos insulation), Riley Power, Inc. (formerly Babcock Borsig Power, Inc., formerly DB Riley, Inc. formerly Riley Stoker Corporation) -- (block and boiler insulation), CBS Corporation (formerly Westinghouse Electric Corporation)–(block, boiler, turbine and turbine insulation, generators and generator insulation, cloth, blankets, adhesives, cement, pipe covering, and micarta), and Uniroyal, Inc.--(cloth, tape, yarn, and adhesives). During various periods of time from the 1960s through 1980s, Anco Insulations, Inc, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.), Taylor Seidenbach, Inc., The McCarty Corporation (successor to McCarty Branton, Inc., and predecessor and successor to McCarty Insulation Sales, Inc.),Gabler Insulations, B&B, and The Cajun Company would package the above-described products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus, making them liable as the manufacturer under Louisiana law. During various periods of time from 1960 through the 1980s, Anco Insulations, Inc, Eagle, Inc. (formerly Eagle Asbestos & Packing Company, Inc.), The McCarty Corporation (successor to McCarty Branton, Inc., and predecessor and successor to McCarty Insulation Sales, Inc.), Taylor

Seidenbach, Inc., Riley Stoker, Foster Wheeler, General Electric, Westinghouse, Gabler
Insulation, B&B, and The Cajun Company also did contracting work at the locations where
Callen Cortez and Calise Cortez were working throughout his career thereby exposing Mr.
Cortez during their handling of asbestos-containing products. Mr. Cortez was exposed to
asbestos-containing products manufactured, distributed, sold, and/or handled by all "defendants"
named in this petition.

54.

The asbestos-containing products manufactured, distributed and/or sold by Anco
Insulations, Inc., Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., Hopeman
Brothers, Inc., Wayne Manufacturing Company, Bayer CropScience, Inc., Uniroyal, Inc., CBS
Corporation, General Electric Company, Foster Wheeler LLC, Riley Stoker, Gabler Insulations,
B&B, The Cajun Company, and International Paper Company were unreasonably dangerous per
se, were defective in design, and constituted a breach of warranty from said manufacturers.
Further, these defendants failed and refused to warn Mr. Cortez of the danger of exposure to such
products. They also failed to warn of the invisible nature of the asbestos and that it could cause
diseases such as mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

55.

As a result of the defective and unreasonably dangerous condition and composition of the
asbestos-containing products manufactured, distributed, and/or sold by Anco Insulations, Inc.,
Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., Hopeman Brothers, Inc., Wayne
Manufacturing Company, Bayer CropScience, Inc., Uniroyal, Inc., CBS Corporation, General
Electric Company, Foster Wheeler LLC, Riley Stoker, Gabler Insulations, B&B, The Cajun
Company, and International Paper Company, Mr. Cortez inhaled asbestos fibers and other
harmful substances emitted by the normal use of said products, proximately causing the
mesothelioma and other related ill health effects from which he suffers. Plaintiff further
contends that these companies are liable as a result of manufacturing, distributing, or selling an
unreasonably dangerous per se product, a product defective in design, for breach of warranty, and
for failing to provide adequate warnings and instructions. Further, these companies are liable for
failing to substitute available alternative products and for fraudulently concealing the dangers of
their products and the health hazards associated with the use and exposure to said products.

56.

Prior to the time Mr. Cortez was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana law.

57.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

58.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Cortez was exposed to products manufactured, distributed, sold, and/or handled by "defendants," and he contracted mesothelioma and other related ill health effects, which was first diagnosed on approximately June 2, 2020.

59.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Cortez, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

60.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Mr. Cortez.

61.

By the time Mr. Cortez began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis and silicosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. Likewise, there were industrial health standards regarding asbestos in Louisiana since 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, Mr. Cortez was never warned of any hazard associated with asbestos or silica, was never protected by use of adequate ventilation, and was required to work next to insulators using asbestos products. He never saw a warning on any asbestos product nor was he warned by any contractor using asbestos or silica products. Despite the fact that all defendants were aware of the hazards of asbestos and silica and other toxic substances to which Mr. Cortez was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law. Even after OSHA became the law in 1971, Mr. Cortez was not warned of the health hazards associated with exposure to asbestos.

- 28 -

62.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioner in the following manner:

1) The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2) The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:
   a) To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;
   b) To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;
   c) To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;
   d) To provide a defense against lawsuits brought for injury resulting from asbestos disease;
   e) To prevent relevant medical inquiry about asbestos disease;
   f) To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and
   g) To induce the Petitioner to use and continue to use asbestos products.

3) The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

4) Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5) Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

63.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the

insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Mr. Cortez was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose money on it." (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85 - 05657, Div. "D", Civil District Court for the Parish of Orleans.)

64.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) is shown by numerous documents and testimony. In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims. The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insureds were working together to discourage plaintiffs from pursuing valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the Borel case of course sets a very bad precedence

for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a **'game plan'** for the continued defense of these asbestosis cases <u>**with the other defendants.**</u>"  In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economocially (sic) impossible for the plaintiffs to pursue the other cases."  These attempts to prevent and stifle valid claims by plaintiffs such as Mr. Cortez shows that the defendants, to this day, are committing fraud.

65.

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud.  Although Johns-Manville (hereinafter sometimes referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants.  In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec.  The initial investigation began in October of 1929 and was completed in January of 1931.  The study included the following:  a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust.  This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan.  Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.).  The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry.  Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem.  On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled

- 31 -

"Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

66.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

67.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way.'" (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American, U.S. Claims Court Civ. No. 465-83C).

68.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

69.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. Members included, among others, Uniroyal, Inc., which is a defendant in this action. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

70.

Another trade organization was the National Insulation Manufacturers Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (defendant

herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions.  NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety.  Charles Limerick, former manager of the Ruberoid Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine.  Ruberoid subscribed and advertised in "Asbestos". Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

71.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels.  These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases.  The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases.  Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

72.

Eagle, Inc. and Taylor-Seidenbach, Inc. did contracting work as early as the 1940s. Likewise, The McCarty Corporation (formerly McCarty Branton, Inc.), Gabler Insulations, Inc., The Cajun Company, and Anco Insulations, Inc. have done contracting work since their initial existence.  Accordingly, Anco Insulations, Inc., Eagle, Inc., The McCarty Corporation (formerly McCarty Branton, Inc.), Gabler Insulations, Inc., The Cajun Company, and Taylor-Seidenbach were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission

- 34 -

in 1943 (discussed *infra*).  Likewise, these companies were also aware of heath and safety requirements regarding asbestos adopted in Louisiana as early as 1943 through the Louisiana Sanitary Code-Industrial Health Regulations.  These standards addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.  Moreover, these companies, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof.  Mr. Cortez was exposed to asbestos both through their contracting work and through products manufactured, distributed, and sold by them throughout his career.  Yet at no time was Mr. Cortez protected from these hazards nor warned of these hazards.  Even after OSHA became the law in 1971, Mr. Cortez was not advised of the hazards associated with exposure to asbestos.  These defendants were aware of the hazards of asbestos but failed and refused to warn Mr. Cortez of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law.  See deposition of Fred J. Schuber, Jr., 05/31/90, pages 149-155, 176-179 and exhibits attached to the deposition of Schuber taken 5/09/90; and deposition of Thomas R. Dimm, 02/03/86, pages 65-66; and Eagle, Inc.'s response #4 to plaintiffs' interrogatories in the case of Atzenhoffer, et al v. National Gypsum, Co., et al, C. A. #89-894, which responses are dated March 27, 1990; and Act No. 532 (1952) amendments to the Louisiana Workers' Compensation Act.

73.

Since the early 1940s, defendant, Foster-Wheeler LLC (formerly Foster-Wheeler Corporation),  was a major manufacturer of boilers used in the construction of both commercial and U.S. Navy vessels at various shipyards throughout the US.  Since that time through and including the time when Mr. Cortez was last exposed, they supplied boilers to virtually every shipyard constructing and repairing vessels in the country.  Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra).  These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.  Despite this knowledge, at no time was Mr. Cortez advised of these hazards as defendants failed and refused to warn Mr. Cortez of the dangers and, furthermore, concealed and suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law.  In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping

connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers.

74.

At various times from approximately 1968 through 1996, Callen Cortez worked on the following premises where he was exposed to asbestos: Pharmacia LLC (formerly, Pharmacia Corporation individually and as successor to Monsanto Company) ("Monsanto"); Shell Oil Company ("Shell"), Occidental Chemical Corporation (f/ka Hooker Chemical & Plastics Corp., f/k/a Hooker Chemical Corporation ("Hooker"); Vulcan Materials Company ("Vulcan"); Goodrich Corporation (f/k/a the Bf Goodrich Company) ("Goodrich"); Axiall Corporation (DE) (f/k/a Georgia Gulf Corporation) ("Georgia Gulf"); Texaco Inc. ("Texaco"); CF Industries Nitrogen, LLC (f/k/a Terra Mississippi Nitrogen, Inc., f/k/a Mississippi Nitrogen, Inc., f/k/a Triad Nitrogen, Inc.) ("Triad"); BASF Corporation (f/k/a Inmont Corporation f/k/a Mew Corporation (Of Delaware) f/k/a BASF Wyandotte Corporation f/k/a Wyandotte Chemicals Corporation) ("BASF"). These defendants were aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that said asbestos and asbestos fiber would cause Callen Cortez (and others similarly situated) to suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects related thereto, but they failed and/or willfully withheld from Mr. Cortez knowledge of the dangers to his health from exposure to asbestos and asbestos fiber. Additionally, at all times during these employments, Callen Cortez was exposed to asbestos and asbestos-containing products manufactured, distributed, handled, and sold by "defendants".

75.

At various times between 1965 and 1984, Calise Cortez worked at Union Carbide Corporation ("Union Carbide"), Entergy Louisiana, LLC ("Entergy"), Pharmacia LLC (formerly, Pharmacia Corporation individually and as successor to Monsanto Company) ("Monsanto"), and Shell Oil Company ("Shell Oil"). Calise Cortez's worked applying and removing asbestos products, including but not limited to asbestos-containing pipe covering, pipe coating, blankets, special fittings, cloths, gaskets, packing, blocks, valves, cements, adhesives, mastics, jackets, board, turbines and/or boilers. On a daily basis throughout the of employment of Calise Cortez, Callen Cortez was exposed to dangerously high levels of asbestos through contact with the person, clothing, and other objects of Calise Cortez as well as through the handling and washing of clothing and other objects belonging to him and through the contamination of the home as a

result thereof. These exposures caused and/or contributed to Callen Cortez's mesothelioma. Union Carbide, Entergy, Pharmacia, and Shell Oil designed their plants to be built with these asbestos products. Union Carbide, Entergy, Pharmacia, and Shell Oil also maintained the care, custody, and control over the asbestos in its plant as well as those contractors who may have handled asbestos. At all times during Calise Cortez's foregoing employments, he was exposed to asbestos and asbestos-containing products manufactured, distributed, handled, and sold by "defendants", and Callen Cortez was exposed to asbestos as a result thereof.

76.

Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy had the responsibility of providing Callen Cortez and/or Calise Cortez with a safe place to work and safety equipment; however they negligently and/or intentionally failed to carry out these duties and failed to protect Callen Cortez and/or Calise Cortez from the dangers of toxic fiber and asbestos dust exposure. Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy allowed and caused Callen Cortez and Calise Cortez to be exposed to asbestos and failed to provide a safe place to work. As owners of the premises containing toxic asbestos, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Callen Cortez and/or Calise Cortez from the unreasonably dangerous conditions created by asbestos which existed on their premises and/or over which defendants had care, custody or control.

77.

Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy had the responsibility of providing Callen Cortez and/or Calise Cortez with a safe place to work and safety equipment; however they negligently and/or intentionally failed to carry out these duties and failed to protect them from the dangers of toxic fiber and asbestos dust exposure. Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy allowed and caused Callen Cortez and/or Calise Cortez to be exposed to asbestos and failed to provide a safe place to work. As owners of the premises containing toxic asbestos, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Callen Cortez and/or Calise Cortez from

the unreasonably dangerous conditions created by asbestos which existed on their premises
and/or over which defendants had care, custody or control.

78.

There were various industry standards in place dating back to 1943 which applied to the
places where Mr. Cortez worked, including Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia
Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy. These industry standards included the
Louisiana Sanitary Code's Industrial Health Regulations, the Walsh Healey Public Contracts Act,
and the OSHA regulations. Thus, these companies were aware or should have been aware of the
hazards of asbestos at least by 1943. These standards required these companies to take protective
measures to protect those individuals on its premises from exposure to asbestos. These standards
required that as a premises owner take the following measures, among others, which defendants
failed to do:

a.   Perform air monitoring for asbestos;

b.   Segregate asbestos work;

c.   Institute local exhaust ventilation and general ventilation;

d.   Provide respiratory protection;

e.   Warn those on the premises of the hazards of asbestos;

f.   Train those on the premises in the proper use of the protective
     equipment;

g.   Require those on the premises to change clothes before going home; and

h.   Preclude dry sweeping of asbestos dust.

79.

In addition to the above acts of negligence, strict liability, and fault identified throughout
this petition, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF,
Union Carbide, and Entergy are strictly liable for failing to properly handle and control the
asbestos which was in its care, custody, and control. Monsanto, Shell, Hooker, Vulcan, Goodrich,
Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy were aware or should have
been aware of the dangerous condition presented by exposure to asbestos, and that Callen Cortez
would suffer from asbestos-related diseases and other ill health effects associated therewith as a
result of this exposure, but they failed and/or willfully withheld from Mr. Cortez knowledge of
the dangers to their health from exposure to asbestos fiber.

80.

In addition to the foregoing acts of negligence and intentional concealment, Monsanto,

Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and

Entergy are liable for the following:

a)   Failing to reveal and knowingly concealing critical medical information to Mr. Cortez;

b)   Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;

c)   Failing to provide necessary protection to Mr. Cortez;

d)   Failing to provide clean, respirable air and proper ventilation;

e)   Failing to provide showers and/or protective clothing to workers;

f)   Failing to advise workers on their premises of the deadly nature of asbestos fiber, and that such fiber could result in the contraction of serious illness and disease;

g)   Failing to reveal and knowingly concealing critical information from Mr. Cortez;

h)   Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

i)   Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

j)   Failing to provide necessary respiratory protection;

k)   Failing to warn workers of the dangers associated with exposure to asbestos and failing to advise workers that they were being exposed to deadly asbestos fiber;

l)   Failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified;

m)  Failing to warn of the dangers of exposure to asbestos;

n)   Failing to warn workers that exposure to asbestos could cause deadly diseases including mesothelioma, lung cancer, asbestosis, pleural thickening, and pleural plaques; and

o)   Failing to warn workers of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, lung cancer, and mesothelioma.

These defendants intentionally or negligently committed these acts when they knew or

should have known full well that Mr. Cortez's injuries would follow or were substantially certain

to follow.

81.

Monsanto was aware of the hazards of asbestos well before Callen Cortez and Calise

Cortez worked on its premises. The asbestos standards identified above discussed the hazards of

asbestos and ways to reduce exposures as early as 1943. Monsanto had knowledge of the

asbestos threshold limit values set forth by the American Conference of Government Industrial Hygienists dating back to 1946. Additionally, Monsanto employed medical doctors and industrial hygienists as early as the 1940s. Dr. R. Emmet Kelly began working for Monsanto in 1936. He was aware of the hazards of asbestos at the time he began working for Monsanto. Dr. Kelly actually attended the Seventh Saranac Symposium in 1952. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, Monsanto's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, Monsanto failed to warn individuals on its premises of the harmful effects that result from the inhalation of asbestos fibers.

82.

In addition, Monsanto, Shell Oil, Texaco, Goodrich, Vulcan, Hooker, BASF, and Union Carbide were members of the National Safety Council. The National Safety Council was established in 1913. The National Safety Council publishes the transactions of the annual Congress to its members. It also issued a National Safety News Magazine to its members. A

number of articles that discussed the risks associated with asbestos exposure were published in either the transactions of the annual Congress or the National Safety News Magazine. Thus, Monsanto, Shell Oil, Texaco, Goodrich, Vulcan, Hooker, BASF, and Union Carbide would have received these publications discussing the hazards of asbestos.

83.

Shell Oil was aware of the hazards of asbestos well before Callen Cortez and Calise Cortez worked on its premises. The asbestos standards identified above discussed the hazards of asbestos and ways to reduce exposures as early as 1943. Additionally, as early as 1945, H.H. Zuidema, a Shell employee reported on asbestos as a carcinogen, which report was provide to the members of the American Petroleum Institute. Other Shell documents likewise reference literature discussing the hazards of asbestos in the 1950s. Additionally, Shell Oil advertised in the Southern Power & Industry publication, which publication included several articles in the 1940s discussing the hazards of asbestos and methods to reduce exposures to asbestos. Also, Shell Chemical was a member of the Manufacturing Chemists Association, which association published a manual dating back to the 1950s, which advised for the need for warning labels for hazardous dust creating products, such as asbestos.

84.

Texaco was aware of the hazards of asbestos well before Callen Cortez worked on its premises. The asbestos standards identified above discussed the hazards of asbestos and ways to reduce exposures as early as 1943. Additionally, as early as 1947, Allan Dooley, an industrial hygienist and employee of Texaco, authored publications reporting asbestos as a hazardous dust. Other Texaco documents dating back to the 1940s identify the hazards of asbestos.

85.

Despite this knowledge, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy remained silent as to the hazards of asbestos, which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims, like Mr. Cortez. Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy failed to advise Callen Cortez and/or Calise Cortez that asbestos could cause him to contract asbestos-related diseases, including asbestosis, lung cancer, and/or mesothelioma. Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy failed to advise Calise Cortez and/or Callen Cortez that he should wear respiratory protection when working with and around

asbestos-containing materials on their premises.  By not advising him of this information, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy mislead Callen Cortez and Calise Cortez into believing that working on their premises around these products did not present a risk to his health.  Moreover, Louisiana law requires that a premises owner provide a reasonably safe working environment, including the providing of the necessary protection to make the workplace safe.  Additionally, by failing to warn Mr. Cortez, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy  were able to obtain the unjust advantage over Mr. Cortez and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from defendants' work environment.  These misrepresentations and suppressions by Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy  were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job.  As a result of these misrepresentations and suppressions, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy sought to avoid having to provide costly respiratory and safety equipment to individuals on its premises.  Also, Monsanto, Shell, Hooker, Vulcan, Goodrich, Georgia Gulf, Texaco, Triad, BASF, Union Carbide, and Entergy sought to prevent or limit occupational disease claims by injured persons and from family members who also contracted disease.  These actions constitute fraud under Louisiana law.

86.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

87.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Cortez was exposed to products manufactured, distributed, sold, and/or used by the defendants in this case, and he contracted mesothelioma, cancer, and other related ill health effects.

- 42 -

88.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Cortez and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

89.

Petitioner's causes of action are based upon the acts and omissions of defendants or those for whom the defendants are responsible, and are specifically not based upon any act committed at the direction of the United States Government.

90.

Callen Cortez was exposed to asbestos during the years of 1984 through 1996. His injuries were caused by defendants' wanton and reckless disregard for public safety in the storage, handling, and transportation of asbestos to which Mr. Cortez was exposed and which resulted in his mesothelioma. All defendants who are at fault for Mr. Cortez's exposure to asbestos during the years of 1984 through 1996 are liable to petitioner for punitive damages pursuant to Article 2315.3 of the Louisiana Civil Code.

91.

As a result of the aforementioned acts of the hereinabove named defendants, Mr. Cortez contracted mesothelioma and other related ill health effects.

92.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to petitioner for the damages sustained as a result of Mr. Cortez's contraction of mesothelioma and other related ill health effects. Petitioner, Callen Cortez, is entitled to damages for the following: past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; fear of death and complications; permanent disability; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; loss of fringe benefits; past, present, and future medical expenses; loss of personal

services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; other expenses incurred as a result of his disease; and all other general damages arising out of this action which may be shown at the trial of this matter.

93.

A trial by jury is demanded on all issues.

**WHEREFORE**, petitioner, Callen J. Cortez, prays that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of petitioner and against defendants for all damages suffered by petitioner together with legal interest and all costs associated with the prosecution of this claim. Petitioner further prays for all general and equitable relief.

Respectfully submitted,

**ROUSSEL & CLEMENT**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
BENJAMIN P. DINEHART - 33096
1550 West Causeway Approach
Mandeville, LA 70471
Telephone: (985) 778-2733
Facsimile: (985) 778-2734
ATTORNEYS FOR PETITIONER,
CALLEN J. CORTEZ

**PLEASE SERVE THE PETITION FOR DAMAGES, OPPOSITION TO MOTIONS FOR EXTENSION OF TIME, NOTICE OF VIDEOTAPED PERPETUATION FOR ALL PURPOSES INCLUDING PERPETUATION PURPOSES, ON THE FOLLOWING:**

1. HUNTINGTON INGALLS INCORPORATED
   (formerly NORTHROP GRUMMAN SHIPBUILDING, INC.,
   formerly NORTHROP GRUMMAN SHIP SYSTEMS, INC.
   formerly, AVONDALE INDUSTRIES, INC.
   formerly AVONDALE SHIPYARDS, INC.
   and formerly, AVONDALE MARINE WAYS, INC.)
   Through its agent for service of process:
   CT Corporation System
   3867 Plaza Tower Dr.
   Baton Rouge, La. 70816

2. ALBERT BOSSIER, JR.
   Through his agent for service of process:
   Brian Bossier
   3421 North Causeway Blvd.
   Suite 900
   Metairie, LA 70002

3. LAMORAK INSURANCE COMPANY
   Through its agent for service of process:
   Secretary of State
   Legal Services Sections
   8585 Archives Ave.
   Baton Rouge, La. 70809

4. BAYER CROPSCIENCE, INC. (SUCCESSOR TO          **LONG ARM SERVICE**
   RHONE POULENC AG COMPANY,
   FORMERLY AMCHEM PRODUCTS, INC.,
   FORMERLY BENJAMIN FOSTER COMPANY)
   (Via Louisiana Long Arm Statute)
   through its agent for service of process:
   Corporation Service Company
   80 State Street
   Albany, New York 12207

5. FOSTER WHEELER LLC                              **LONG ARM SERVICE**
   (formerly FOSTER WHEELER CORPORATION)
   (Via Louisiana Long Arm Statute)
   The Corporation Trust Company
   Corporation Trust Center
   1209 Orange Street
   Wilmington, Delaware 19801

6. GENERAL ELECTRIC COMPANY
   Through its agent for service of process:
   CT Corporation System
   3867 Plaza Tower Dr.
   Baton Rouge, La. 70816

7. HOPEMAN BROTHERS, INC.                          **LONG ARM SERVICE**
   (Via Louisiana Long Arm Statute)
   C T CORPORATION SYSTEM
   4701 Cox Rd Ste 285
   Glen Allen, VA, 23060

8. THE MCCARTY CORPORATION
   (SUCCESSOR TO MCCARTY BRANTON, INC.
   AND PREDECESSOR AND SUCCESSOR TO
   MCCARTY INSULATION SALES, INC.)

Through its agent for service of process:
Paul H. Spaht
4232 Bluebonnet Blvd.
Baton Rouge, LA 70809

9.    TAYLOR-SEIDENBACH, INC.
      Through its agent for service of process:
      Hal Shepard
      731 South Scott St.
      New Orleans, LA 70119

10.   UNIROYAL, INC.                                    **LONG ARM SERVICE**
      (Via the Louisiana Long Arm Statute)
      70 Great Hill Road
      Naugatuck, CT 06770

11.   CBS CORPORATION                                   **LONG ARM SERVICE**
      (f/k/a WESTINGHOUSE ELECTRIC CORPORATION)
      Through its agent for service of process:
      Corporation Service Company
      251 Little Falls Drive
      Wilmington, DE 19808

12.   EAGLE, INC.
      Through its agent for service of process:
      Susan B. Kohn
      1100 Poydras St.
      New Orleans, LA 70163

13.   INTERNATIONAL PAPER COMPANY
      Through its agent for service of process:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, La 70816

14.   ANCO INSULATIONS, INC.
      Through its agent for service of process:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, La 70816

15.   RILEY POWER, INC. (formerly BABCOCK BORSIG POWER, INC.
      formerly DB RILEY, INC., formerly RILEY STOKER CORPORATION)
      Through its agent for service of process:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

16.   PHARMACIA LLC (f/k/a PHARMACIA CORPORATION INDIVIDUALLY AND AS
      SUCCESSOR TO MONSANTO COMPANY, SUCCESSOR TO MONSANTO
      CHEMICAL COMPANY, AND SUCCESSOR TO LION OIL COMPANY)
      Through its registered agent for service of process:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

17.   SHELL OIL COMPANY
      Through its agent for service of process:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

18.    OCCIDENTAL CHEMICAL CORPORATION (formerly, HOOKER CHEMICALS &
PLASTICS CORP., formerly, HOOKER CHEMICAL CORPORATION)
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

19.    VULCAN MATERIALS COMPANY
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

20.    GOODRICH CORPORATION          **LONG ARM SERVICE**
(f/k/a THE BF GOODRICH COMPANY)
Through its agent for service of process:
CT Corporation System
28 Liberty St.
New York, New York 10005

21.    AXIALL CORPORATION (DE)
(f/k/a GEORGIA GULF CORPORATION)
Through its agent for service of process:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

22.    TEXACO INC.          **LONG ARM SERVICE**
Through its agent for service of process:
The Prentice-Hall Corporation System, Inc.
2711 Centerville Road, Suite 400
Wilmington, DE 19808

23.    CF INDUSTRIES NITROGEN, LLC (f/k/a TERRA MISSISSIPPI NITROGEN, INC.,
f/k/a MISSISSIPPI NITROGEN, INC., f/k/a TRIAD NITROGEN, INC.)
Through its agent for service of process:
Corporation Service Company
501 Louisiana Ave
Baton Rouge, LA 70802

24.    BASF CORPORATION f/k/a INMONT CORPORATION f/k/a MEW CORPORATION
(OF DELAWARE) f/k/a BASF WYANDOTTE CORPORATION f/k/a WYANDOTTE
CHEMICALS CORPORATION
Through its registered agent:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

25.    CONTINENTAL INSURANCE COMPANY (successor by merger to FIDELITY AND
CASUALTY COMPANY OF NEW YORK)
Through its agent for service of process:
Secretary of State
Legal Services Sections
8585 Archives Ave.
Baton Rouge, La. 70809

26.    HOUSTON GENERAL INSURANCE COMPANY
Through its agent for service of process:
Secretary of State
Legal Services Sections
8585 Archives Ave.
Baton Rouge, La. 70809

27.   BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY (f/k/a
      STONEWALL INSURANCE COMPANY)
      Through its agent for service of process:
      Secretary of State
      Legal Services Sections
      8585 Archives Ave.
      Baton Rouge, La. 70809

28.   UNITED STATES FIDELITY AND GUARANTY COMPANY
      Through its agent for service of process:
      Secretary of State
      Legal Services Sections
      8585 Archives Ave.
      Baton Rouge, La. 70809

29.   FIRST STATE INSURANCE COMPANY
      Through its agent for service of process:
      Secretary of State
      Legal Services Sections
      8585 Archives Ave.
      Baton Rouge, La. 70809

30.   UNION CARBIDE CORPORATION
      Through its registered agent:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

31.   ENTERGY LOUISIANA, LLC
      Through its agent for service of process:
      John A. Braymer
      446 North Blvd.
      Baton Rouge, LA 70802

32.   LIBERTY MUTUAL INSURANCE COMPANY
      Through its agent for service of process:
      Secretary of State
      Legal Services Sections
      8585 Archives Ave.
      Baton Rouge, La. 70809

33.   TRAVELERS INDEMNITY COMPANY
      Through its agent for service of process:
      Secretary of State
      Legal Services Sections
      8585 Archives Ave.
      Baton Rouge, La. 70809

34.   LOUISIANA INSURANCE GUARANTY ASSOCIATION
      (ON BEHALF OF AMERICAN MUTUAL LIABILITY INSURANCE COMPANY)
      2142 Quail Run Drive
      Baton Rouge, LA 70808

35.   THE CAJUN COMPANY
      Through its registered agent:
      James L. Pate
      1001 W. Pinhook Rd.
      Suite 200
      Lafayette, LA 70503