UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CALLEN J. CORTEZ, ET AL.                                    CIVIL ACTION

VERSUS                                                              NO. 20-2389

LAMORAK INSURANCE COMPANY,                      SECTION "R" (1)
ET AL.

## ORDER AND REASONS

Before the Court is defendant ViacomCBS Inc.'s ("Westinghouse") motion for partial summary judgment as to decedent Callen Cortez's claims arising from alleged exposure to Westinghouse's turbines.[1]  Plaintiffs and Huntington Ingalls Inc. ("Avondale") oppose the motion.[2] Westinghouse contends that plaintiffs have not produced evidence sufficient to sustain their burden to show that Callen Cortez was exposed to asbestos attributable to Westinghouse.[3]

For the following reasons, the Court grants in part and denies in part defendant's motion.

---

[1]    R. Doc. 499.
[2]    R. Docs. 643 & 648.
[3]    R. Doc. 499-1.

## I.    BACKGROUND

This is an asbestos exposure case.  Plaintiffs allege that decedent Callen Cortez contracted mesothelioma as a result of exposure to asbestos over the course of his career,[4] as well as take-home exposure resulting from his father's[5] and brothers' work when the family shared a home.[6]  Callen Cortez lived in his family home in Kraemer, Louisiana, starting from his birth in 1951, until he married and moved out in May of 1972.[7] Decedent's brothers, Daniel Cortez and Mitchell Cortez, also lived in the home. Daniel began working at the Avondale Shipyards on August 29, 1967,[8] and remained living with Callen Cortez at their family home until Daniel married and moved out in July of 1968.[9] Daniel testified that he worked with asbestos insulation, and that fibers released from the cloth got onto his work clothes.[10]  Some of this work involved insulating vessels which were equipped with Westinghouse turbines.[11]  He further testified that, after work each day, he would come home, hang up his clothes, and, with Callen Cortez's help, beat the fibers off

---

4    R. Doc. 1-1 at 3-6 (Complaint ¶¶ 3, 8).
5    *Id.* at 7-9 (Complaint ¶¶ 11-16).
6    R. Doc. 149 at 1-2 (Second Amended Complaint ¶¶ 94-95).
7    R. Doc. 499-4 at 17-18 (Discovery Deposition of Callen Cortez at 100:11- 101:8).
8    R. Doc. 499-6 at 13 (Deposition of Daniel Cortez at 12:3-13).
9    *Id.* at 12-13 (Deposition of Daniel Cortez at 11:21-12:2).
10    *Id.* at 37 (Deposition of Daniel Cortez at 36:6-13).
11    *Id.* at 32 (Deposition of Daniel Cortez at 31:5-16).

his clothes.[12]  Mitchell Cortez also lived with decedent until Callen Cortez moved out of their family home in 1972.[13]  He likewise testified that he worked at Avondale as an insulator while he lived with decedent,[14] worked on ships equipped with Westinghouse vessels,[15] and brought home asbestos dust on his clothing.[16]

Callen Cortez testified that he worked at the Monsanto plant in Luling, Louisiana during the summer of 1968 doing roustabout work.[17]  He recalled working on a turbine that was manufactured by either Westinghouse or GE.[18] He fabricated and handled Garlock gaskets while working on this turbine.[19] Furthermore, on March 6, 1969, Callen Cortez began working for Avondale.[20]  He worked as a welder and tacker helper, primarily at Avondale's Westwego Yard, until May 31, 1974.[21]  Decedent's duties included

---

[12]  *Id.* at 18-19 (Deposition of Daniel Cortez at 17:16-18:17).
[13]  R. 648-9 at 2 (Deposition of Mitchell Cortez at 14:6-10).
[14]  *Id.* at 4 (Deposition of Mitchell Cortez at 16:6-12).
[15]  *Id.* at 17 (Deposition of Mitchell Cortez at 49:7-9).
[16]  *Id.* at 14 (Deposition of Mitchell Cortez at 46:14-25).
[17]  R. Doc. 499-4 at 139 (Discovery Deposition of Callen Cortez at 222:19-24).
[18]  *Id.* at 193-194 (Discovery Deposition of Callen Cortez at 276:6-277:25).
[19]  *Id.* at 193-196 (Discovery Deposition of Callen Cortez at 276:2-279:21).
[20]  *Id.* at 26-27 (Discovery Deposition of Callen Cortez at 108:25-109:9).
[21]  *Id.*

working on Westinghouse turbines and handling asbestos gaskets that were utilized on the turbines.[22]

Callen Cortez was diagnosed with mesothelioma on June 2, 2020.[23] On July 1, 2020, he filed suit in the Civil District Court for the Parish of Orleans against Westinghouse and approximately thirty-four other defendants, including former employers, manufacturers, and insurance companies.[24]  In their complaint, plaintiffs bring various products liability, negligence, and intentional tort claims.[25]  On August 31, 2020, the case was removed to federal court.[26]  Callen Cortez passed away on May 26, 2022.[27]  Cortez's surviving spouse and children subsequently filed an amended complaint on June 6, 2022,[28] substituting themselves as plaintiffs in a survival action and seeking additional damages arising from Cortez's alleged wrongful death.[29]

Relevant to the motion before the Court, plaintiffs seek to hold Westinghouse—a firm that manufactured turbines at the time decedent was exposed to asbestos—liable for Cortez's exposure to asbestos while working

---

[22]    *Id.* at 63-64 (Discovery Deposition of Callen Cortez at 146:6-147:10).
[23]    R. Doc. 1-1 at 10 (Complaint ¶ 17).
[24]    *Id.* at 1-3 (Complaint ¶¶ 1-2); *id.* at 45-48.
[25]    R. Doc. 1-1.
[26]    R. Doc. 1 (Notice of Removal).
[27]    R. Doc. 1026 at 2 (Fourth Amended Complaint ¶ 111).
[28]    *Id.*
[29]    *Id.* at 2-3 (Fourth Amended Complaint ¶¶ 111-114).

near or on Westinghouse's turbines.[30]  Plaintiffs allege this exposure occurred during Cortez's employment, where he worked with asbestos-containing gaskets and near asbestos insulation used on the turbines,[31] as well as take-home exposure from the employment of his brothers who worked with and near asbestos insulation used on Westinghouse turbines.[32] Westinghouse moves for partial summary judgment, seeking dismissal of plaintiffs' claims arising from Cortez's alleged exposure to Westinghouse's turbines.[33]  Westinghouse argues that decedent cannot show he was exposed to a Westinghouse turbine at Monsanto, that his exposures were not substantial factors in causing his mesothelioma, and that Westinghouse is not liable for any of the asbestos products Cortez was exposed to.[34]  Plaintiffs and Avondale oppose the motion.[35]

The Court considers the parties' arguments below.

## II.  LEGAL STANDARD

---

[30]  R. Doc. 1-1 at 3-6 (Complaint ¶¶ 32-35); *see also* R. Doc. 648 at 3-7.
[31]  *Id.*
[32]  R. Doc. 149 at 1-2 (Second Amended Complaint ¶¶ 94-95).
[33]  R. Doc. 499.
[34]  R. Doc. 499-1 at 6-15.
[35]  R. Docs. 643 & 648.

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence

6

which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

Under Louisiana law, in an asbestos exposure case, the claimant must show that (1) "he had significant exposure to the product complained of," and that (2) the exposure to the product "was a substantial factor in bringing about his injury." *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1091 (La. 2009) (quoting *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 948 (La. App. 4 Cir. 1998)).  The plaintiff bears the burden of proof on both elements. *Vodanovich v. A.P. Green Indus., Inc.*, 869 So. 2d 930, 932 (La. App. 4 Cir. 2004).

As the Fifth Circuit has explained, "[e]ven if the plaintiff was only exposed to asbestos for a 'short period for an employer[,] and he had longer exposure working for others, it cannot be said the relatively short asbestos exposure was not a substantial factor in causing his mesothelioma.'" *Williams v. Boeing Co.*, 23 F.4th 507, 512 (5th Cir. 2022) (quoting *Rando*, 16 So. 3d at 1091).  To defeat an asbestos defendant's motion for summary judgment, a plaintiff "need only show that a reasonable jury could conclude that it is more likely than not that [plaintiff] inhaled defendant's asbestos

fibers, even if there were only 'slight exposures.'" *Id.* (citing *Held v. Avondale Indus., Inc.*, 672 So. 2d 1106, 1109 (La. App. 4 Cir. 1996)).

The substantive law that governs plaintiffs' claims is the law in effect when the alleged exposure occurred. *Rando*, 16 So. 3d at 1072. Relevant here is Louisiana products-liability law, which, prior to the enactment of the Louisiana Products Liability Act ("LPLA") in 1987, was summarized by the Louisiana Supreme Court in *Halphen v. Johns-Manville Sales Corp.*, 484 So. 2d 110 (La. 1986). *See Cole v. Ashland Chem., Inc.*, No. 09-6584, 2010 WL 5141248, at *1 n.2 (E.D. La. Dec. 10, 2010) ("The exposures at issue in this case occurred prior to the enactment of the [Louisiana Products Liability Act] so the pre-Act principles espoused in *Halphen* apply.").

In *Halphen*, the Louisiana Supreme Court explained that "[i]n order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control." 484 So. 2d at 113. At issue here is whether Westinghouse's product was "unreasonably dangerous," under any of the recognized theories of liability: (1) unreasonably dangerous in construction or composition, (2) unreasonably dangerous per se, (3) unreasonably dangerous in design, or (4) unreasonably dangerous for

failure to warn.  *See id.* at 113-15.  Only the latter three are relevant here; plaintiffs do not allege that Westinghouse's turbines were defective in construction or composition.

The Louisiana Supreme Court defined these three products-liability theories as follows.  First, a product is "unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product."  *Id.* at 114 (collecting cases).  A product may be defective in design (1) if it is unreasonably dangerous per se, (2) if "alternative products were available to serve the same needs or desires with less risk of harm," or (3) if "there was a feasible way to design the product with less harmful consequences."  *Id.* at 115.  As to warnings, a product is "unreasonably dangerous . . . if the manufacturer fails to adequately warn about a danger related to the way the product is designed."  *Id.* at 114-15.  Further, "[a] manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user."  *Id.* at 115.

Because, as a matter of law, Westinghouse's liability is different with respect to the asbestos gaskets and asbestos-containing insulation used with its turbines, the Court deals with these issues separately.

## A.    Asbestos Gaskets

Plaintiffs allege that Callen Cortez was exposed to asbestos gaskets affixed to Westinghouse turbines, for which Westinghouse should be held liable.[36]  They claim alleged exposures occurred at Monsanto and Avondale.[37]

Specifically, plaintiffs assert that while Cortez worked as a pipefitter at Avondale from March of 1969 to May of 1974, he was exposed to asbestos gaskets at Avondale that were part of Westinghouse turbines.  Plaintiffs offer the following deposition testimony of Callen Cortez to substantiate the claim that Westinghouse turbines were at Avondale and decedent was in their vicinity:

> **Q.**   When you were working at Avondale, . . . you worked around turbines?
>
> **A.**   Yes.
>
> **Q.**   When you were working around turbines, were there folks who were working on those turbines?
>
> **A.**   Yes.
>
> . . .
>
> **Q.**   Yes.  Sure.  Do you remember the brand of turbines that you saw insulation work being done?
>
> **A.**   Yes.  Westinghouse and General Electric Turbines.[38]

---

[36]   R. Doc. 648 at 5.

[37]   *Id*. at 4-5.

[38]   R. Doc. 648-5 at 2-3 (Discovery Deposition of Callen Cortez at 146:6-147:10).

Plaintiffs also offer the following testimony to show that Cortez worked on Westinghouse turbines and handled asbestos gaskets while working on the turbine's flanges:

**Q.** You talked about working as a pipefitter on turbines and you described Westinghouse and General Electric turbines.

**A.** Yes.

**Q.** When you worked as a pipefitter on General Electric turbines, did you actually work on the turbine itself?

**A.** I broke the flanges off of the turbines and I changed valves.

**Q.** And so the flanges that you had to work on, you had to scrape gaskets off of them?

**A.** Yes.

**Q.** And put new flanges and put new gaskets on them?

**A.** Yes.

**Q.** Since there was an objection, describe to me when you worked on the flanges, those flanges on the turbines were component parts of the turbines; correct?

**A.** Yes.

**Q.** Describe for me how you would change the flanges that were component parts of the Westinghouse turbines.

**A.** We would unbolt the flanges, spread them open, scrape all the gasket material off.  And if we had to replace a valve, we'd replace the valve and then we'd put it all back together with new gasket material.

**Q.** And you did that on many flanges?

**A.** Yes.

**Q.** And on many Westinghouse turbines?

**A.**   Yes.[39]

Cortez also testified that the gaskets used on the Westinghouse turbines at Avondale were Garlock 7705 gaskets.[40]  Further, Westinghouse's representative, Roy C. Bellanger, testified in 2014 that Westinghouse manufactured and sold turbines for installation on vessels at Avondale, and that Westinghouse supplied, or specified that the turbines use, asbestos-containing gaskets.[41]  Specifically, Bellanger confirmed that Westinghouse turbines were sold to Avondale in the following excerpt, among others:

> **Q.**   For the Navy vessels, was the contract sale for the Westinghouse turbines, was that with Avondale, or was it with the Navy?
>
> **A.**   To my knowledge, the contract was with Avondale.
>
> **Q.**   So with regards to the steam turbines that were sold to Avondale, was Westinghouse aware that they would have to be insulated?
>
> **A.**   Yes.[42]

He further testified that Westinghouse was to supply metallic asbestos gaskets with their turbines:

---

[39]   *Id.* at 18-19 (Discovery Deposition of Callen Cortez at 792:4-794:16).

[40]   *Id.* at 20 (Discovery Deposition of Callen Cortez at 805:8-14).

[41]   R. Doc. 648-11 at 12-13, 22-24, 27 (Deposition of Roy C. Bellanger at 50:9-51:9; 60:9-61:8; 66:1-20; 69:2-25, *Comardelle v. Pa. Gen. Ins. Co.*, No. 12-6555 (E.D. La. Nov. 5, 2014)).

[42]   *Id.* at 9 (Deposition of Roy C. Bellanger at 34:3-14)

**Q.**   Is it correct that Westinghouse provided insulation attachments with their turbines for the 1078 class ships?

**A.**   Yes.

. . .

**Q.**   And it's your understanding that this drawing would apply for all 1078 class ships?

**A.**   Yes.

**Q.**   Okay.  If you would please refer to note 16?  And if you could read that note for me please?

**A.**   Note 16.  For connections furnished in accordance with figure 2, mating flanges, bolts, nuts, and spiral wound metallic asbestos gaskets are to be furnished by Westinghouse.

. . .

**Q.**   Is it your understanding that Westinghouse would supply an asbestos gasket for use as represented in figure 2?

**A.**   Yes.[43]

Bellanger likewise explained how the asbestos gaskets Westinghouse specified were used on the turbines:

**Q.**   And whenever you have the document in front of you, if you would please describe it?

**A.**   I have in front of me Bates No. U.S.S. 1040 CL-4, Westinghouse drawing 668J928  The name in the title block is: piping oil.

**Q.**   And similarly, sir, the Bate No. U.S.S. 1040, that refers to the 1040 class of vessels?

**A.**   Yes.

---

[43]   *Id.* at 11-12 (Deposition of Roy C. Bellanger at 49:19-50:19, 60:5-8).

**Q.** Thank you, sir.  If you would please look at parts 82 through 91, these parts refer to asbestos gaskets; is that correct?

**A.** Yes.

**Q.** Now, if you could take a moment and please describe for me how part numbers 82 through 91 are utilized in the turbine?

**A.** These are the flange connection gaskets that connect the various oil lines that are integral to the turbine.[44]

In addition to the above testimony, Bellanger confirmed that Westinghouse did not issue warnings about asbestos in connection with its products.[45]  And Westinghouse does not rebut plaintiffs' suggestion, based on Bellanger's testimony, that the asbestos gaskets were supplied, or at least specified for, Westinghouse turbines.

Plaintiffs also assert that while Callen Cortez was working at the Monsanto plant in Luling, Louisiana, he was exposed to Westinghouse's turbines and inhaled asbestos for which Westinghouse should be held liable.[46]  To support this contention, plaintiffs offer Cortez's deposition testimony, where he recalled that while working at Monsanto in 1968, he

---

[44]   *Id.* at 26-27 (Deposition of Roy C. Bellanger at 68:22-69:18)

[45]   *Id.* at 28-29 (Deposition of Roy C. Bellanger at 70:5-71:6).

[46]   R. Doc. 648 at 4.

helped a mechanic work on a turbine that was manufactured by either Westinghouse or General Electric.[47]  The testimony is as follows:

> **Q.** Okay. . . .  I am going to start with that first job that you worked at, Monsanto.  And that was sometime in the late '60s; right?
>
> **A.** Right.
>
> . . .
>
> **Q.** When you worked at Monsanto on that first occasion, did you personally work on any turbines?
>
> **A.** Yes.
>
> . . .
>
> **Q.** All right.  What work were you doing on turbines at Monsanto?
>
> **A.** I was like a helper working with a diesel mechanic.
>
> . . .
>
> **Q.** Okay. . . . Do you remember the brand or manufacturer of any of the turbines that you assisted this gentleman with at Monsanto on that first occasion?
>
> **A.** It was either Westinghouse -- Westinghouse or General Electric, one of them.
>
> **Q.** You don't know which?
>
> **A.** I don't know exactly which one, no.
>
> . . .
>
> **Q.** Do you remember how it is you identified this piece of equipment as made by General Electric or Westinghouse?
>
> **A.** I'm telling you there was a plaque in the -- in the metal --

---

[47]   R. Doc. 648-5 at 6-7 (Discovery Deposition of Callen Cortez at 276:6-277:25).

**Q.**    Okay.  Do you remember any information --

**A.**    -- with the name on it.

**Q.**    -- other than the name that was on that plaque?

**A.**    No. [48]

Cortez also testified that in performing his work, he handled the

gaskets that went on the turbine:

**Q.**    And you were working with this gentleman who may have been doing some work on the turbine?

**A.**    Uh-huh (affirmatively).  Yes.

. . .

**Q.**    Do you remember what work you were helping him do on this turbine?

**A.**    Basically removing the -- the components that connected to the turbine so he could get to the area he had to work on.

. . .

**Q.**    Okay.  Do you know how long it took you to assist this gentleman disconnecting whatever it was you were disconnecting?

**A.**    I know we worked on it for a whole month.

. . .

**Q.**    And so you said that you were handing him tools and things . . . .  Do you know whether you handed him any part that needed to go back on the turbine that contained asbestos?

**A.**    Other than gaskets.  I handed him gaskets.

---

[48]    *Id.* at 6-9 (Discovery Deposition of Callen Cortez at 276:2-279:21).

Cortez then goes on to identify the gaskets that had to be affixed to the turbine as well as his role in assisting the mechanic to fabricate them:

> **Q.**   Did you make the gaskets or did he make the gaskets?
>
> **A.**   He's the one that taught me how to make gaskets, so I was right there watching him.
>
> . . .
>
> **Q.**   Do you know the brand or manufacturer of the gaskets that were used on that turbine?
>
> **A.**   It looked -- it looked like Garlock.
>
> . . .
>
> **Q.**   Do you know who sold or supplied those gaskets to Monsanto?
>
> **A.**   No.[49]

In addition to the above testimony, plaintiffs point to Westinghouse's response to their interrogatories admitting that it manufactured and sold turbines for use at Monsanto.[50]   Taken together, the above summary judgment evidence creates a triable issue of fact as to whether Cortez was exposed to asbestos gaskets utilized on Westinghouse turbines.

Westinghouse's arguments that pre-LPLA law negates plaintiffs' theories of liability as to the gaskets is unpersuasive.   If Westinghouse

---

[49]   *Id.* at 16 (Discovery Deposition of Callen Cortez at 289:1-17).

[50]   R. Doc. 648-7 at 3 (Westinghouse's Responses to Plaintiffs' Interrogatories).

18

directly supplied asbestos gaskets to Avondale, Westinghouse may be held liable for supplying a product that is unreasonably dangerous per se. *See Halphen v. Johns-Manville Sales Corp.*, 788 F.2d 274, 275 (5th Cir. 1986) (noting that "the Supreme Court of Louisiana places asbestos in that category" of products that are unreasonably dangerous per se). Under this theory, "what [Westinghouse] knew or could have known about the inherent danger of asbestos [i]s irrelevant to the question of its liability for proximately-caused injury." *Id.*

Summary judgment should likewise be denied as no evidence suggests Westinghouse issued warnings in connection with the use of asbestos gaskets. Accordingly, even if Westinghouse did not itself supply the gaskets, and instead specified that asbestos gaskets be used in connection with its turbines, a reasonable jury may nonetheless find Westinghouse liable for failure to warn about a "danger related to the way the product is designed." *Halphen*, 484 So. 2d at 114-15. Westinghouse cites no pre-LPLA cases rejecting a duty to warn based on facts like these. To be sure, Westinghouse does cite to Louisiana cases that state that "a manufacturer or seller cannot be liable in a products liability action where it proves that it did not manufacture, install, or sell the component part alleged to be defective." *Home Ins. Co. of Illinois v. Nat'l Tea Co.*, 577 So. 2d 65, 74 (La. App. 1 Cir.

1990) (citing *Newman v. Gen. Motors Corp.*, 524 So. 2d 207, 209 (La. App. 4 Cir. 1988).[51]  But this rule, as stated and applied in *Home Insurance* and *Newman*, does not answer the question presented by the facts of this case.

In *Home Insurance*, the Louisiana First Circuit affirmed the trial court's finding that an oven manufacturer and seller were not liable for a fire, because the wiring defect at issue was created by another party's installation of the wiring.  *Id.*  And in *Newman*, the Louisiana Fourth Circuit affirmed the trial court's finding that the vehicle manufacturer, GMC, was not liable for the plaintiff's injuries because it did not design, manufacture, or assemble the defective trailer ratchet.  524 So. 2d at 209.  In both cases, the manufacturer/seller had no relationship to the defect.  The defendants had not supplied, specified, or even recommended the use of the defective product.  Indeed, the *Newman* court recognized as much when it noted that the case was "not a case where GMC as the manufacturer incorporated another's product into its vehicle or held the vehicle out to be its own, *together with component parts manufactured by another.*"  *Id.* (emphasis added).

Here, plaintiffs have submitted evidence creating an issue of fact as to whether Westinghouse supplied or specified asbestos gaskets as a

---

[51]    R. Doc. 499-1 at 8.

"component part[]" of its turbines.  The disconnect between manufacturer and defect that characterizes *Home Insurance* and *Newman* is not present in this case.  These cases, and the other factually similar Louisiana cases that Westinghouse and the *Newman* court cite,[52] do not warrant summary judgment in favor of Westinghouse, insofar as plaintiffs' claims arise out of the use of asbestos gaskets on Westinghouse's turbines.  *See, e.g.*, *Duhon v. Petroleum Helicopters, Inc.*, 554 So. 2d 1270, 1278 (La. App. 3 Cir. 1989) (finding an aircraft manufacturer not liable because the aircraft accidents at issue resulted from the malfunction of an engine that "was not the engine in the aircraft at the time of its manufacture or its sale"); *Landry v. E.A. Caldwell, Inc.*, 280 So. 2d 231, 235 (La. App. 1 Cir. 1973) (finding a motor-scooter manufacturer not liable because the throttle mechanism that caused the accident was "a completely foreign device"); *St. Pierre v. Gabriel*, 351 So. 2d 821, 824 (La. App. 1 Cir. 1977) (finding an electric-saw manufacturer not liable because the defect was caused by a substituted spring that did not come on the saw, and was not the manufacturer's spring).  And the only other products-liability cases that Westinghouse cites are from other jurisdictions,

---

[52]     *Id.* at 8, 10.

and apply either maritime law or out-of-state jurisprudence.[53]  These cases are not controlling on or persuasive for this Court.

Lastly, Westinghouse's assertions that Cortez's alleged exposures were not enough to be a "substantial factor" in causing his mesothelioma misconstrue Louisiana law.  As the Fifth Circuit has explained, "[e]ven if the plaintiff was only exposed to asbestos for a 'short period for an employer[,] and he had longer exposure working for others, it cannot be said the relatively short asbestos exposure was not a substantial factor in causing his mesothelioma.'"  *Williams v. Boeing Co.*, 23 F.4th 507, 512 (5th Cir. 2022) (quoting Rando, 16 So. 3d at 1091).  Further, the "frequent and regular" requirement for asbestos exposure that Westinghouse cites "refers to the quality of the exposure during the employment period, not to the length of that period."  *Hoerner v. ANCO Insulations, Inc.*, 812 So. 2d 45, 64 (La. App. 4 Cir. 2002), *writ denied*, 819 So. 2d 1023 (La. 2002).  To defeat an asbestos defendant's motion for summary judgment, a plaintiff "need only show that a reasonable jury could conclude that it is more likely than not that [plaintiff] inhaled defendant's asbestos fibers, even if there were only 'slight exposures.'"  *Id.* (citing *Held v. Avondale Indus., Inc.*, 672 So. 2d 1106, 1109 (La. App. 4 Cir. 1996)).  Here, Cortez testified that he personally worked with

---

[53]      R. Doc. 499-1 at 9-14.

asbestos gaskets with Westinghouse turbines on multiple occasions, and a reasonable jury could certainly conclude that such exposures led to inhalation of asbestos dust.

For these reasons, the Court denies summary judgment as to the use of asbestos gaskets on Westinghouse's turbines.


**B.    Insulation**

Plaintiffs also assert that Westinghouse should be liable because Cortez was exposed to asbestos dust from insulation used on Westinghouse turbines.[54]  These exposures allegedly occurred through both Cortez's own employment, as well as take-home exposures from his family members who worked at Avondale.[55]  The Court need not recount plaintiffs' evidence supporting the alleged exposures in detail, because Westinghouse is entitled to summary judgment regardless of the veracity of plaintiffs' contentions.

It is not disputed that the asbestos insulation that customers used on Westinghouse's turbines was not manufactured or supplied by Westinghouse.   Plaintiffs rely on testimony from Bellanger, but this testimony fails to support any theory of liability that would prevent dismissal

---

[54]    R. Doc. 648-1 at 3-6.

[55]    *Id.*

23

of Westinghouse's claims as to exposures to turbine insulation. Bellanger testified that Westinghouse's steam turbines had to be insulated to keep exterior temperatures sufficiently low.[56] He also testified that if the turbines were not insulated, which "[n]o engineer would ever" approve of, catastrophic equipment failure could ensue.[57] Bellanger likewise testified that asbestos was a popular insulation option at the time Cortez and his family members assert exposure to Westinghouse turbines, and that military specifications called for the use of asbestos. His deposition proceeded as follows:

> **Q.** Back in the '60s and early '70s, Westinghouse was aware that asbestos-containing thermal insulation was widely used in the ship building industry; correct?
>
> **A.** I think it's generally accepted. Yes.
>
> **Q.** And Westinghouse, likewise, was aware that asbestos-containing thermal insulation materials would have been used to insulate its turbines; correct?
>
> **A.** Westinghouse would have been aware that it would have been insulated to whatever the military spec dictated at that time.
>
> **Q.** And the military specs called for the use of asbestos insulation; correct?
>
> **A.** To the best of my knowledge, yes.[58]

---

[56]  R. Doc. 648-11 at 9-10 (Deposition of Roy C. Bellanger at 34:11-35:20, *Comardelle v. Pa. Gen. Ins. Co.*, No. 12-6555 (E.D. La. Nov. 5, 2014)).

[57]  *Id.* at 41-42 (Deposition of Roy C. Bellanger at 100:3-101:11).

[58]  *Id.* at 47-48 (Deposition of Roy C. Bellanger at 109:23-110:17).

This record regarding insulation does not create an issue of fact supporting a products-liability claim against Westinghouse under any of the theories enumerated in *Halphen*.  First, while asbestos-containing insulation may be unreasonably dangerous per se, *see Halphen*, 788 F.2d at 275, plaintiffs have submitted no evidence that Westinghouse manufactured or supplied asbestos-containing insulation.  Accordingly, to survive summary judgment on Westinghouse's liability for the subsequent insulation of its turbines, plaintiffs must point to material facts going to either defective design or failure to warn.  Plaintiffs argue both of these theories in their opposition to Westinghouse's motion for summary judgment.[59]  The Court addresses each theory in turn.

The Court finds that plaintiffs' design-defect claim fails.  As noted above, if not unreasonably dangerous per se, a product may nonetheless be unreasonably dangerous in design if (1) "alternative products were available to serve the same needs or desires with less risk of harm," or if (2) "there was a feasible way to design the product with less harmful consequences." *Halphen*, 484 So. 2d at 115.  Plaintiffs contend that "Westinghouse's own corporate representative confirmed that it designed its marine turbines to be

---

[59]    R. Doc. 648 at 16-20.

insulated with asbestos and that it knew asbestos was to be used."[60] But this assertion is not an accurate characterization of Bellanger's deposition testimony. That testimony indicated that Westinghouse knew that its turbines required insulation, that asbestos was a popular insulation option used at the time, and that military specifications called for asbestos insulation. There is no evidence that Westinghouse's design of its turbines required that they be insulated with asbestos. With no showing that the turbine's "design" included an asbestos requirement or even recommendation, the Court finds that plaintiffs are unable to meet their burden on a design-defect claim against Westinghouse based on the insulation of its turbines.

This leaves the question of plaintiffs' failure-to-warn claim. The Court finds that this claim must also fail. As an initial matter, *Halphen* and the cases it cites deal only with a duty to warn stemming from dangers inherent in the manufacturer's own product. They do not establish a duty to warn against dangers inherent in others' products that may be used with the manufacturer's product. *See id.* at 115 (citing *Winterrowd v. Travelers Indem. Co.*, 462 So. 2d 639 (La. 1985); *Hebert v. Brazzel*, 403 So. 2d 1242 (La. 1981); and *Chappuis v. Sears Roebuck & Co.*, 358 So. 2d 926 (La. 1978)).

---

[60]     *Id.* at 16.

For instance, *Winterrowd* involved the manufacturer's duty to warn that its punch press might make an "uninitiated double stroke" and crush the operator's fingers.  462 So. 2d at 641-42.  *Hebert* discussed whether a valve manufacturer had a duty to warn of "the danger of breaking the valve['s] stem with a large wrench due to excessive torque."  403 So. 2d at 1245.  And *Chappuis* involved a hammer retailer's duty to warn that the hammer should be discarded if it becomes chipped.  358 So. 2d at 930.  The *Halphen* court did not cite any cases discussing a manufacturer's failure to warn of "danger[s] inherent in the use of" *others'* products that may later be used with the manufacturer's own product.

And plaintiffs have not cited, and this Court has not found, any *Halphen*-era Louisiana cases in which a manufacturer was held liable for failure to warn of a product's dangers when the manufacturer did not manufacture, sell, design, install, specify, require, or recommend the product alleged to be dangerous.  While *Newman*, 524 So. 2d at 209, and *Home Insurance*, 577 So. 2d at 74, discussed above, do not entitle to Westinghouse to summary judgment as to the asbestos gaskets, those cases support this Court's conclusion that Westinghouse had no duty to warn of dangers related to the possible use of asbestos insulation on its turbines.  *See id.* ("[A] manufacturer or seller cannot be liable in a products liability action where it

proves that it did not manufacture, install, or sell the component part alleged to be defective."). In the absence of any authority indicating that a manufacturer in Westinghouse's position has a duty to warn of the dangers of a third party's product, the Court finds that plaintiffs' failure-to-warn theory is meritless. Accordingly, Westinghouse is entitled to summary judgment as to plaintiffs' failure-to-warn claims arising out of third-party use of asbestos-containing insulation on its turbines.

Plaintiffs' other arguments in opposition are without merit. First, plaintiffs point to Bellanger's testimony that Westinghouse knew asbestos was an insulation option and that military specifications called for its use. But this evidence does not establish that Westinghouse designed its turbines to be used with asbestos insulation. It indicates only that Westinghouse knew that asbestos was a possible insulator for its turbines and that asbestos would most likely be used for military vessels. Even though Westinghouse may have foreseen that asbestos insulation would be used on its turbines, plaintiffs have submitted no Louisiana legal authority indicating that foreseeability, without more, is sufficient to generate a duty to warn of the dangers of another manufacturer's product. On the contrary, as discussed above, *Halphen* and the cases it cites contemplate dangers inherent in the

manufacturer's own product. *See Winterrowd*, 462 So. 2d at 641-42; *Hebert*, 403 So. 2d at 1245; and *Chappuis*, 358 So. 2d at 930.

Second, plaintiffs cite two Louisiana cases in support of his argument that Westinghouse had a duty to warn,[61] but neither is apposite here.  In neither case did the asbestos defendants argue that their products did not contain, or were not accompanied by, asbestos.  Instead, they argued that the plaintiffs had not shown that they worked around their products.  The court rejected the argument and found issues of fact in both cases.  *See Danos v. Avondale Industries, Inc.*, 989 So. 2d 160, 163 (La. App. 4 Cir. 2008) (finding an issue of fact as to whether the manufacturer's boilers were present on the destroyer escorts where decedent worked); *Berthelot v. Avondale Industries, Inc.*, 841 So. 2d 91, 93-94 (La. App. 4 Cir. 2003) (finding that summary judgment was precluded because plaintiff's testimony contradicted the manufacturer's testimony regarding whether plaintiff worked around the manufacturer's boilers).  Accordingly, neither *Danos* nor *Berthelot* supports plaintiffs' position that Westinghouse may be held liable for failure to warn for dangers caused by a third party's product that Westinghouse did not manufacture, sell, design, install, specify, recommend, or require.

---

[61]    R. Doc. 648 at 13.

Westinghouse is therefore entitled to summary judgment as to plaintiffs' products-liability claims arising out of insulation of its turbines.

For the foregoing reasons, Westinghouse's motion for summary judgment[62] is granted in part, and denied in part.  The Court grants the motion as to plaintiffs' claims regarding the use of asbestos-containing insulation on Westinghouse's turbines.  The Court denies the motion as to plaintiffs' claims regarding asbestos gaskets supplied or specified by Westinghouse.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Westinghouse's motion for partial summary judgment.[63]


New Orleans, Louisiana, this __8th__ day of July, 2022.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE


---

[62]   R. Doc. 499.
[63]   *Id.*

30