UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CALLEN J. CORTEZ, ET AL. | CIVIL ACTION |
| VERSUS | NO. 20-2389 |
| LAMORAK INSURANCE COMPANY, ET AL. | SECTION "R" (1) |

**ORDER AND REASONS**

Before the Court is the motion of defendant Hopeman Brothers, Inc. ("Hopeman") for partial summary judgment on the issues of whether Hopeman was a manufacturer or professional vendor of asbestos-containing products.[1] Plaintiffs and Huntington Ingalls, Inc. ("Avondale") oppose the motion.[2] For the following reasons, the Court grants in part and denies in part Hopeman's motion.

**I. BACKGROUND**

This is an asbestos exposure case. Plaintiffs allege that Callen Cortez contracted mesothelioma as a result of exposure to asbestos over the course

---

[1] R. Doc. 494.
[2] R. Docs. 666 & 691.

of his career,[3] as well as take-home exposure resulting from his father's[4] and brothers' work when the family shared a home.[5]

Hopeman is a subcontractor that performed marine carpentry or "joiner" work at Avondale Shipyards during the period in which Callen Cortez and his brother, Daniel Cortez, worked at Avondale.[6] Under its contracts with Avondale, Hopeman provided both marine carpentry services and the materials necessary to perform the work.[7] Wayne Manufacturing Corporation ("Wayne"), a now-dissolved Virginia corporation,[8] was a wholly-owned subsidiary of Hopeman during the relevant period.[9] Hopeman regularly purchased and supplied to Wayne Micarta laminate manufactured by Westinghouse and Marinite boards manufactured by Johns-Manville, both of which contained asbestos.[10] Wayne glued the Micarta laminate to the Marinite boards and sent the composite wallboards

---

[3]  R. Doc. 1-1 at 3-6 (Complaint ¶¶ 3, 8).
[4]  *Id.* at 7-9 (Complaint ¶¶ 11-16).
[5]  R. Doc. 149 at 1-2 (Second Amended Complaint ¶¶ 94-95).
[6]  R. Doc. 494-1 at 1 (Hopeman's Statement of Uncontested Material Facts ¶ 4).
[7]  R. Doc. 666-15 at 2 (Deposition of John Baker at 78:17-22).
[8]  R. Doc. 498-15 (Wayne Articles of Incorporation).
[9]  R. Doc. 498-1 at 2 (Hopeman's Statement of Uncontested Material Facts ¶ 17).
[10] R. Doc. 494-2 at 2 (Deposition of Charles Johnson at 115:17-22).

to Hopeman at Avondale for installation on vessels.[11] Hopeman worked on about 72 vessels constructed at Avondale shipyards during the twelve-year period it supplied asbestos wallboards to Avondale.[12]

Callen Cortez lived in his family home in Kraemer, Louisiana, starting from his birth in 1951 until he married and moved out in May of 1972.[13] Daniel Cortez also lived in the home. Daniel began working at the Avondale Shipyards on August 29, 1967,[14] and lived with Callen Cortez until Daniel moved out in July of 1968.[15] Daniel testified that he was exposed to asbestos at Avondale when he worked around Hopeman's employees while they were cutting asbestos-containing wallboards.[16] He further testified that fibers released from the wallboards likely got onto his work clothes.[17] He also

---

[11] R. Doc. 498-1 at 3 (Hopeman's Statement of Uncontested Material Facts ¶ 10).
[12] R. Doc. 494-1 at 1-2 (Hopeman's Statement of Uncontested Material Facts ¶ 4 n.4).
[13] R. Doc. 499-4 at 17-18 (Discovery Deposition of Callen Cortez at 100:11- 101:8).
[14] R. Doc. 499-6 at 13 (Deposition of Daniel Cortez at 12:3-13).
[15] *Id.* at 12-13 (Deposition of Daniel Cortez at 11:21-12:2).
[16] *Id.* at 58-63 (Deposition of Daniel Cortez at 57:23-62:18).
[17] *Id.* at 37 (Deposition of Daniel Cortez at 36:6-13).

testified that when he came home from work each day, he removed his clothes, and, with Callen Cortez's help, beat the fibers off of them.[18]

From March 6, 1969 until May 31, 1974, Callen Cortez worked for Avondale as a welder and tacker helper, primarily at Avondale's Westwego Yard.[19] Cortez testified that when he worked at Avondale, he was exposed to asbestos dust generated by Hopeman's employees while they were cutting wallboards in his vicinity in ships' galleys, living quarters, and other areas.[20]

Cortez was diagnosed with mesothelioma on June 2, 2020.[21] On July 1, 2020, he sued Hopeman and approximately thirty-four other defendants, including former employers, manufacturers, and insurance companies.[22] In his petition, plaintiff brought various negligence, products liability, and

---

[18]   *Id.* at 18-19 (Deposition of Daniel Cortez at 17:16-18:17).
[19]   *Id.* at 26-27 (Discovery Deposition of Callen Cortez at 108:25-109:9).
[20]   R. Doc. 666-4 at 2-3 (Discovery Deposition of Callen Cortez at 120:20-121:2); *see also* R. Doc. 494-2 at 2.
[21]   R. Doc. 1-1 at 10 (Complaint ¶ 17).
[22]   *Id.* at 1-3, 11-13 (Complaint ¶¶ 1-2, 25-29).

intentional tort claims against defendants.[23] He additionally asserted that Wayne was the alter ego of Hopeman during the relevant period.[24]

Callen Cortez passed away on May 26, 2022.[25] Cortez's surviving spouse and children filed an amended complaint on June 6, 2022,[26] substituting themselves as plaintiffs in a survival action and seeking additional damages arising from Cortez's alleged wrongful death.[27]

Hopeman is sued by plaintiffs in its capacity as a supplier of asbestos-containing wallboards.[28] Plaintiffs allege that Hopeman was a manufacturer, or alternatively, a professional vendor, of asbestos-containing wallboards.[29] Hopeman now moves for partial summary judgment on manufacturer and professional vendor liability.[30] Plaintiffs and Avondale oppose the motion.[31] The Court considers the motion below.

## II.  LEGAL STANDARD

---

[23]  R. Doc. 1-1.
[24]  *Id.* at 43 (Complaint ¶ 90).
[25]  R. Doc. 1026 at 2 (Fourth Amended Complaint ¶ 111).
[26]  *Id.*
[27]  *Id.* at 2-3 (Fourth Amended Complaint ¶¶ 111-114).
[28]  R. Doc. 1-1 at 11-12 (Complaint ¶ 25-29).
[29]  *Id.*
[30]  R. Doc. 493.
[31]  R. Docs. 666 & 691.

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence

6

which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

7

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Manufacturer Liability

Plaintiffs argue that Hopeman is a manufacturer by attributing Wayne's assembly of the asbestos wallboards to Hopeman.[32] They contend that Wayne's actions are attributable to Hopeman because Wayne was the alter ego of Hopeman or that they were a single business enterprise.[33] The Court has already rejected liability for Hopeman under alter ego or single business enterprise theories in its August 10, 2022 Order and Reasons, which granted summary judgment to Hopeman against plaintiffs on these issues. *See generally Cortez v. Lamorak Ins. Co.*, No 20-2389, 2022 WL 2714111 (E.D. La. July 13, 2022). That ruling forecloses plaintiffs' arguments here. Plaintiffs make the same arguments that the Court rejected in its August 10, 2022 Order. Accordingly, the Court holds that Wayne's assembly of the wallboards did not render Hopeman a manufacturer of these asbestos-containing products.

---

[32] R. Doc. 666 at 3.
[33] *Id.* at 1-3.

Next, plaintiffs assert that Hopeman is liable under the Louisiana Products Liability Act's definition of a manufacturer.[34] But the "Louisiana Supreme Court has held that the LPLA does not apply retroactively because it is substantive." *Moore v. BASF Corp.*, No. 11-1001, 2011 WL 5869597, at *2 (E.D. La. Nov. 21, 2011) (internal quotation marks removed); *see Gilboy v. Amer. Tobacco Co.*, 582 So.2d 1263, 1264-65 (La. 1991) (explaining that the LPLA "alters substantive rights" and "[a] statute that changes settled law relating to substantive rights only has prospective effect."); *Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) ("[T]he LPLA applies only to those causes of action that accrued on or after September 1, 1988."). Plaintiffs cite no authority that the LPLA's manufacturer definition is retroactive, and concede that the LPLA does not apply to this case because Cortez's toxic exposures occurred before its enactment.[35] Plaintiffs nevertheless argue that the LPLA's definition is germane here because the portion of the LPLA at issue merely restates preexisting law. And, plaintiffs contend, Hopeman satisfies that definition.

The Court need not decide whether the LPLA provision at issue merely restates preexisting law or otherwise applies retroactively, because the

---

[34]   *Id.*
[35]   R. Doc. 666 at 3 n.17.

9

provision in question would not render Hopeman a manufacturer in any event. Plaintiffs rely on language in the LPLA that states that the term manufacturer includes a "manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer." La. Rev. Stat. § 9:2800.53(1)(b). Plaintiffs contend that Hopeman falls within this definition because it manufactured (at least, partially) the vessels at Avondale by virtue of installing the walls that separated various quarters in the vessels, and Hopeman incorporated another's product (the wallboard) into the vessels. The Court will not adopt the strained interpretation plaintiffs propose. The cited provision of the LPLA applies when a firm that manufactures a final product incorporates others' goods into it. Here, Hopeman was a subcontractor that merely furnished a component to Avondale, which was responsible for the final product, i.e., the vessels. Other courts agree that Hopeman was not a manufacturer of asbestos products. Numerous Louisiana courts have granted summary judgment or directed verdicts in Hopeman's favor on the issue of manufacturer liability. *See, e.g.*, *Buqoui v. Huntington Ingalls, Inc.*, No. 11-7786 (La. Civ. D. Ct. Apr. 2, 2012) (granting Hopeman's motion for summary on the issue of whether it was a manufacturer of asbestos-containing products); *Becnel v. Am. Motorists Ins. Co*, No. 12-6486 (La. Civ. D. Ct. May 9, 2013) (likewise); *Cagle v.*

*Huntington Ingalls, Inc.*, No. 16-1875 (La. Civ. D. Ct. Jan. 25, 2017) (same); *Jones v. Am. Emp. Ins. Co.*, No. 14-6711 (La. Civ. D. Ct. Feb. 2, 2016) (granting Hopeman's motion for a directed verdict on whether it was a manufacturer of asbestos-containing products).

Additionally, none of the cases Hopeman points to is apposite. *Radalec, Inc. v. Automatic Firing Corporation* involved a defendant that manufactured air conditioners composed of parts fabricated by other concerns. 81 So. 2d 830, 833 (La. 1955). Unlike the present case, the relevant issue there was whether defendant may still be liable as a manufacturer when it did not manufacture the specific defective component in the air conditioning unit. *Id.* at 833 n.3. Likewise, in *Spillers v. Montgomery Ward & Co.*, the defendant substantially modified a truck to carry pulpwood, which is dissimilar to the work that Hopeman did here. 294 So. 2d 803 (La. 1974). Further, in *Spillers*, the defendant had actually manufactured "the pulpwood loader and it did all the things necessary to adapt Spillers' truck for hauling pulpwood." *Id.* at 807. Here, Hopeman did not manufacture the wallboard, nor did it substantially modify the vessels it worked on by merely installing wallboard pursuant to contract specifications. For similar reasons, *Winterrowd v. Travelers Indemnity Co.* is inapposite. 452 So. 2d 269 (La. App. 2 Cir. 1984). Hopeman did not

"substantially modif[y] or materially alter[] the product" at issue here. *Id.* at 273-74. *LeBouef v. Goodyear Tire & Rubber Company* is also distinguishable, because it involved an automaker seeking to avoid liability when one of the car's tires, manufactured by a separate concern, failed. 623 F.2d 985, 990 (5th Cir. 1980). Finally, *Rasmussen v. Cashio Concrete Corporation* is inapposite. 484 So. 2d 777, 779 (La. App. 1 Cir. 1986). In that case, Cashio Concrete Corporation's own president testified that the firm had manufactured the product at issue. *Id.* Further, the *Rasmussen* court found that "the components of the [product at issue] were purchased from various suppliers and integrated into a single, concrete unit by defendant." *Id.* There is no analogous assembly of a complete unit by Hopeman here. Accordingly, plaintiffs' authorities do not support their claims of manufacturer liability, and Hopeman is entitled to summary judgment on this issue.

### B. Professional Vendor Liability

Hopeman also moves for partial summary judgment on the issue of whether it was a professional vendor of asbestos-containing wallboards.[36]

---

[36] R. Doc. 493.

Under Louisiana law, a "professional vendor" is held to the same standard of liability as a manufacturer. *Chappuis v. Sears Roebuck & Co.*, 358 So. 2d 926, 930 (La. 1978). In order to be held liable as a professional vendor, a seller must: (1) hold a "product out to the public as its own" and (2) operate with the requisite "size, volume, and merchandising practices," such that the firm is presumed to know the defects of its wares. *Id.* Hence, "a professional vendor is a retailer who does more than simply sell a certain product or products; it must engage in practices whereby it is capable of controlling the quality of the product, such that the courts are justified in treating the retailer like a manufacturer." *Nelton v. Astro-Lounger Mfg. Co.*, 542 So. 2d 128, 132 (La. App. 1 Cir. 1989). Because of the scale and merchandising requirements necessary for a finding that a firm is a professional vendor, a seller does not become a professional vendor just because it sells a product. *Id.* ("[W]e reject plaintiff's contention that Fraenkel is a professional vendor simply because it is in the business of selling sofa beds.").

The facts relevant to Hopeman's sale of wallboards are as follows. Hopeman was engaged as a subcontractor at Avondale to provide the engineering services, labor, and materials necessary to install wallboards on 72 vessels constructed at the shipyard during the years 1961 and 1965 to

13

1976.[37] Under its contracts, Hopeman furnished and installed asbestos-containing wallboard in galleys and living quarters of the vessels.[38] John Baker, a former Hopeman executive, testified that Hopeman charged Avondale for the materials it furnished under its joiner contracts.[39] Bertram Hopeman, a former officer for Hopeman, confirmed that Hopeman's contracts with Avondale were for both services and materials.[40] Hopeman purchased the components of the wallboards from Johns-Manville, which sold a Marinite core, and from Westinghouse, which sold a Micarta veneer. Hopeman supplied these materials to its subsidiary, Wayne, which glued the two wallboard components together. Hopeman furnished the finished wallboards to Avondale and installed them on vessels being constructed at Avondale's shipyard.

Plaintiffs contend that, like the defendant in *Chappuis* who "was deemed a 'professional vendor' due to the control it exercised over the design of the product," *Shapiro v. Wal-Mart Stores, Inc.*, No. 93-3245, 1994 WL 577346, at *3 n.3 (E.D. La. Oct. 17, 1994), Hopeman exercised significant control over the quality of the wallboards at issue and is therefore a

---

[37] R. Doc. 494-1 at 1-2 (Hopeman's Statement of Material Facts ¶ 4 n.4).
[38] *See* R. Doc. 494-2 at 2.
[39] R. Doc. 666-15 at 2 (Deposition of John Baker at 78:17-22).
[40] R. Doc. 691-7 at 14 (Deposition of Bertram Hopeman at 336:10-21).

professional vendor.[41]   Hopeman does not contest that it selected and purchased the components of the wallboards that Wayne regularly assembled for Hopeman.  Further, this Court previously deemed Hopeman a sophisticated purchaser of Micarta, one of the two asbestos-containing components of the wallboards.[42]  The Court finds that Hopeman's familiarity with the products and its control over the selection of the wallboard components and its selection of the company that would assemble them raise an issue of fact as to whether Hopeman exerted sufficient control over the quality of the product for professional vendor liability.

The evidence also raises an issue of material fact as to whether Hopeman held itself out as the supplier of the wallboard.  First, Hopeman's contracts identified Hopeman as the supplier of the wallboard.[43] Additionally, Hopeman purchased the wallboard components, directed Wayne to assemble the wallboard, and had the wallboard sent to Avondale. Further, Hopeman's invoices to Avondale for the wallboards listed Hopeman as the vendor.[44]  Finally, a number of individuals over the years, including

---

[41]   R. Doc. 666 at 6-8.
[42]   *See Cortez v. Lamorak Ins. Co.*, No 20-2389, 2022 WL 2714111, at *8 (E.D. La. July 13, 2022).
[43]   *See* R. Doc. 691-7 at 14 (Deposition of Bertram Hopeman at 336:10-21); R. Doc. 666-15 at 2 (Deposition of John Baker at 78:17-22); R. Doc. 691-17.
[44]   R. Doc. 691-17.

15

Callen Cortez and his brothers, associated the wallboards with Hopeman.[45] In sum, Hopeman's invoices, its contracts, and the identification of Hopeman with the wallboards by the workers on-site together support an inference that Hopeman held the wallboards out as its own.

Further, there is evidence supporting an inference that Hopeman's sales were on a scale sufficient to be deemed a professional vendor. Hopeman admits that it performed joiner work at Avondale beginning in 1961 until the mid-1990s, with continuous operations from 1965 onward.[46] Additionally, Hopeman furnished asbestos-containing products for installation on approximately 72 vessels at Avondale until the mid-1970s.[47] Callen Cortez testified that he also worked around Hopeman's employees who cut wallboards at Halter Marine's Lockport shipyard in the mid-1970s. This evidence, that Hopeman operated at multiple sites and furnished asbestos wallboard for over a decade on 72 ships, creates an issue of material

---

[45] *See* R. Doc. 691-15 at 2-3 (Deposition of Logan Lefort at 54:1-55:15) & R. Doc. 691-16 at 3-5 (Deposition of Donald Rome at 64:1-66:16); Avondale also asserts that the wallboard arrived in Hopeman's trucks with Hopeman's logo displayed prominently on the vehicles, but there is no mention of this in the exhibit to which Avondale points. *See* R. Doc. 691-20 at 2 (Deposition of Jose Cochran at 35-36).
[46] R. Doc. 494-1 at 1 (Hopeman's Statement of Uncontested Material Facts ¶ 4).
[47] *Id.* (Hopeman's Statement of Uncontested Material Facts ¶ 5).

fact as to whether Hopeman operated on the requisite scale to be a professional vendor.

As plaintiffs have created material fact issues on whether Hopeman had control over the quality of the product, held it out as its own, and operated with the scale necessary to be deemed a professional vendor, the Court denies summary judgment on whether Hopeman was a professional vendor of asbestos-containing products.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Hopeman's motion for partial summary judgment.

New Orleans, Louisiana, this __29th__ day of August, 2022.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE